Filed 6/2/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S072316 |
| v. | ) | |
| | ) | |
| VERONICA UTILIA GONZALES, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCD114421 |
| _____ | ) | |

Defendant Veronica Utilia Gonzales was convicted of murdering Genny Rojas.[1] The jury found as special circumstances that the murder was intentional and involved the infliction of torture,[2] and occurred while defendant was engaged in the commission and attempted commission of mayhem.[3] It returned a verdict of death. On this automatic appeal, we affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution*

Defendant was the aunt of Genny Rojas. Genny and her siblings were removed from the custody of defendant's sister Mary Rojas, after Mary went into a drug rehabilitation program and her husband was arrested for child molestation. Genny was

---

[1]    Penal Code, section 187, subdivision (a).  Further undesignated statutory references are to the Penal Code.

[2]    Section 190.2, subdivision (a)(18).

[3]    Section 190.2, subdivision (a)(17)(J).

1

first placed with defendant's mother, but defendant agreed to take Genny in because her mother had other children to care for. Early in 1995, when she was four years old, Genny came to live with defendant, her husband Ivan, and their six children in an apartment in Chula Vista.

On the evening of July 21, 1995, Marisa Lozano, a young neighbor in the apartment building, was standing outside when she heard a child crying in defendant's apartment. Shortly thereafter, she heard a bang, "like if something hit a wall." The crying stopped. Ivan Gonzales looked out a window, then shut it and closed the curtains. A few minutes later Ivan came out of the apartment, slammed the door, and left, looking angry. Marisa's Aunt Noemi then called for her to come inside, as she was supposed to each night at 8:00. Ivan appeared at a local liquor store around 8:45 p.m., where he bought milk, cereal, and candy. No more than an hour later Marisa heard a commotion, and someone said that a little girl had died. Going outside, Marisa saw Ivan carrying a child into the apartment where Marisa's Aunt Patti lived. Marisa heard defendant say, "don't call the cops."

Noemi Espinoza testified that sometime after 9:00 that evening there was some noise and she heard someone call to her. She came out of her apartment and saw Ivan carrying a little girl. Noemi asked him what had happened. Ivan told her the child had burned herself with hot water, and that she did not know how to regulate the water. Defendant was standing next to Ivan. Noemi asked him to bring the child into her sister Patti's apartment, which was across from the Gonzaleses'. Ivan did so, followed by defendant. He placed the child on the floor as Noemi told him to do. She had been trained as a nurse's assistant, and proceeded to check for a pulse and breathing. There were none, and the body was dry, very cold, and slightly rigid. Nevertheless, Noemi tried to perform cardiopulmonary resuscitation (CPR), and told her husband to call 911. Defendant "said not to call the police because they will get blamed for it." Noemi was unable to revive the child, and believed she had been dead for a while. Noemi noticed a

2

bald spot on the child's head, marks on her neck and right arm, and a purplish color on her leg.

While Noemi was attempting CPR, defendant was running in and out of the apartment, looking very nervous. Ivan sat on the couch but left after a couple of minutes. Noemi remembered that earlier in the evening, between 6:00 and 7:00, the Gonzaleses' son Ivan, Jr. had come to Patti's apartment and asked for some rubbing alcohol. Noemi noticed that "he had a very weird, blank stare."

Around 9:20 p.m., officers William Moe and Barry Bennett of the Chula Vista police arrived at the scene. Moe met defendant as he approached the apartment. Defendant told him she had put the baby in the bathtub, and later found her not breathing. Moe checked the child for a pulse and respiration, but did not attempt CPR because both he and Bennett concluded she was "obviously dead." The body was "very cold to the touch." Bennett noted that the child was wearing only a shirt, which was dry, as was her hair. She had bare patches and open wounds on her scalp, signs of trauma on her face, and a ligature mark under her throat. She was "a little rigid," leading Bennett to think that rigor mortis might be setting in. As he knelt next to the body, defendant said she had run the bath water, put the child in the bath, and then gone to cook dinner. About 20 minutes later, she returned and the child had slipped under the water, so she grabbed her and went to another apartment to call 911. As defendant spoke, Ivan was sitting there "like an observer." Moe and Bennett then went to the Gonzales apartment, where they found the other children. The bathtub was empty and dry.

Ten or fifteen minutes after the police arrived, the fire department came to the apartment. The fireman who assessed the victim found her cold and without a pulse. When he tilted her head and grasped her chin to try to open an airway, he found that her jaw was locked and her teeth tightly clenched, an "obvious sign" of rigor mortis. He did not try CPR, deciding it was too late.

3

A medical examiner arrived around 1:00 a.m. He noted a thermal burn from the waist to the toes and numerous other injuries on the body, especially the face. An autopsy was performed later that morning. A burn injury extended irregularly from the top of Genny's head down and across the back of her scalp. This burn was in the process of healing, but was infected. The medical examiner estimated that it was from six days to several weeks old. There was hair loss in the burn area, and thinning and bald patches elsewhere on the scalp. These could have been caused by the hair being pulled out or by nutritional deficiencies. There were scars on Genny's shoulders that were consistent with burn injuries. They matched the burned area on the back of her head, if the neck was bent back. An area of hair was spared between the burn on the head and the shoulders, which was also consistent with the head being tilted back at the time of the burn. The injury could have been caused by a hot liquid being poured over Genny's head.

The examiner discovered a subdural hematoma inside the skull. This was a life-threatening injury for a four-year-old like Genny. It could have been caused by a blow or by violent shaking, and appeared to be a few hours old. The examiner also noted a subarachnoid hemorrhage, which is typically the result of a direct impact to the head. This was not a life-threatening injury, and was weeks or perhaps months old. There was a pinpoint hemorrhage, or petechiae, in the white of Genny's right eye. This injury, which can be caused by strangulation, normally disappears after a few days if the victim survives. The area around the right eye was bruised. The examiner estimated that this injury was a few days old. The left eye was also bruised. There were abrasions above both eyes in the eyebrow area. Linear abrasions extended across Genny's face from her left ear, and the skin was worn away on the bridge of her nose. The skin on the rim of both ears was also worn off, exposing the cartilage. These abrasions could have been caused by a tight band around her head.

There were bruises on Genny's right cheek and chin. On both cheeks, there were recent burns in a grid pattern, which matched the grill of a blow dryer found in the

4

Gonzales apartment.[4]  These appeared to have occurred within hours before Genny's death.  One of these scars curved in a way that indicated Genny may have pulled away when it was inflicted.  Both cheeks also bore multiple small circular marks, which could have been caused by the bristles of a brush.  Inside Genny's lower lip was a laceration, extending down into the gutter between the gum and lip.  This injury was inflamed, and could have been several days old.

Genny's neck was marked with linear scars, ulcerated in places, which were consistent with a long period of hanging with her weight partially supported by her feet.  They were probably one to three weeks old.  There were also linear, ulcerated scars around Genny's upper arms, which could have been caused by handcuffs over an extended period.[5]  Scars on her wrists could have been caused by handcuffs or by a cord.  On her right shoulder were burn marks in a grid pattern matching the burns on Genny's cheeks, and the shoulder was scraped as well.  The left arm had multiple injuries, including abrasions and a recent bruise, the handcuff scars, diagonal scars that appeared to be old injuries, and recent burns in the grid pattern.  The top of the left shoulder was bruised and abraded, with some triangular scars.  Genny's thighs were bruised in a pattern indicating that they had been grabbed forcefully, several times.  There were ulcerated areas on the back of her ankles, which were several days to a couple of weeks old.  Genny's spleen and thymus glands were atrophied, a sign of chronic stress.

The burn on Genny's lower body was a deep, third-degree burn, which removed the superficial layer of her skin.  Areas on the back of her knees were spared, indicating that she had been kneeling when burned.  Similar sparing was evident in the groin area, where the skin was pressed together and thus protected from the hot water.  This burn,

---

[4]    The blow dryer was set on high, and not plugged in when it was collected by an evidence technician.

[5]    A pair of handcuffs were found in the Gonzales apartment, and they matched Genny's scars.

which extended from Genny's chest to her feet, was recent, probably hours old. It appeared to be a forcible immersion burn, in which she was held down with her hands and arms out of the water, unable to get herself up. There was no evidence of the splashing that would have occurred if she tried to get out of the water. The burn could have been inflicted in three to 10 seconds by water between 140 and 148 degrees. This burn was the cause of death, although it would have been a survivable burn had treatment been sought. Without treatment, a child Genny's size would go into shock and die in as little as three hours. As the state of shock progressed, the child would slowly lose consciousness, becoming pale, cold, and clammy. Rigor mortis could set in within two or three hours of death. The examiner ruled out drowning as a cause of death, because there was no water in Genny's lungs. He deemed the death a homicide, in that the burn did not appear to be accidental.

The prosecutor also called to the stand a pediatrician with expertise in injuries caused by child abuse, including burns and head injuries. The doctor's testimony was consistent with that of the medical examiner, whose report he had reviewed. The doctor further noted, based on his examination of photographs of Genny's injuries, that areas on her buttocks were less burned than surrounding areas, suggesting she had been held down so that the bottom of the tub kept the buttocks from contacting the hot water. From a single splash mark burn on her torso, he concluded that the water was between 140 and 150 degrees, and that she had entered the water vigorously. From the overall pattern of the burn he deduced that she had been immersed for around 10 seconds in a fully filled tub of hot water, with her knees flexed, leaning forward. Considerable force had to have been applied to produce the areas of spared skin, and to prevent Genny from escaping.

The burn could not have been caused by adding hot water to a tub half full of water at a tolerable temperature. The doctor testified that shock was the likely cause of death. The state of shock could have peaked within a few hours, with death occurring soon thereafter. With modern burn care, the survival rate for such a burn would be in the

range of 90 percent, although the victim would be permanently scarred and might suffer long-term problems such as joint deformity.

The doctor found the burn injury on the back of Genny's head inconsistent with a scenario in which she had spilled a pot of hot food from a stove, because the burn was restricted to the back of the head and the shoulders. It was also unlikely to have been caused by hot tap water, unless Genny had been lying on her stomach with her head tilted back under the tap. It could have been caused by pouring a cup of hot water onto the scalp while tilting the head back. The subdural hematoma Genny suffered was caused by the application of great force, as was the injury to her lip. The triangular marks on her shoulder appeared to be burns inflicted with a barrel-shaped object like a curling iron.

An evidence technician came to the Gonzales apartment the night Genny died. A residue of human skin, including toenails, was found in the bathtub. The water temperature from the tap reached 156 degrees, then dropped to 148 degrees after five minutes. After running for 15 minutes, the water in the tub reached the overflow drain and was 140 degrees.

One of the bedroom doors had a rag tied around both doorknobs, attached to a piece of twine that was tied to a drawer handle on a nightstand close to the wall and near the door. In the area between the door, the nightstand, and the wall was a blanket. The blanket was moist, smelled of urine and feces, and appeared to be bloodstained. In the wall behind the door was an indentation about 36 inches from the floor, which matched the size of Genny's head and was stained with what appeared to be blood or diluted blood. There were similar stains elsewhere on this area of the wall, which could have been produced by the wispy hair on the back of Genny's head. A cut-off section of pant leg was found in this room, tied on one side so as to form a cap or hood. Hair and what appeared to be bloodstains were found on this material.

In a closet in the same bedroom was a large wooden box. A sliding door had been removed from its track and leaned into the closet, propped against the box and braced by

a desk outside the closet. The top edge of the box next to the closet wall was about two inches wide. A reddish-brown material consistent with blood or feces was collected from this surface. A stain on the edge of the box appeared to be a toe print, and there were more stains inside the box, as well as feces. Above the box in the center of the closet was a brace supporting the wooden clothes bar. Attached to this brace was a strong steel hook. There was a hole in the closet door, positioned so that by looking through the hole from the outside one would see the hook. Bloodstains were found on the underside of the clothes bar, the brace, the inside of the closet door, and the back wall of the closet above the box. Among the stains on the wall was a small footprint, just above the box.

An expert in bloodstain pattern analysis testified that the stains in the closet were consistent with a 38-inch tall child with a head injury having been fastened to the hook by the neck while standing on the box, and shaking or rubbing blood onto the various surfaces where it was found. Because of the patterns, and the fact that some of the stains appeared to be blood diluted with serous fluid from the wounds, the expert believed there were a number of such episodes.

The prosecutor presented two videotaped interviews defendant gave to the police after waiving her right to remain silent. The jurors were given transcripts. The prosecutor began with the second interview, conducted on July 24, 1995, several days after Genny's death. Defendant said she had begun making dinner around 7:00 on the night Genny died. She put Genny in a lukewarm bath around 7:30. Ivan was in the kitchen. Defendant looked in on Genny after seven to 10 minutes. Ivan went to the store and came back in less than five minutes. About 20 minutes after she first checked on Genny, defendant took the blow dryer away from her children because they had been playing with it and it was hot. As she walked past the bathroom, she saw Genny lying in the tub, face up but turned to the side. The water was now very hot.

Defendant said she pulled Genny from the tub and called Ivan. They took her into a bedroom and used a fan to try to cool her off. They also used rubbing alcohol in an

8

effort to cool her and to rouse her with the smell. They blew on her, and attempted CPR. Water was coming out of her mouth. After five or 10 minutes, Genny was not responding, so defendant went to Patti's apartment for help. Defendant saw that Genny was red when she took her out of the bath, and her skin was peeling. When asked if she saw marks on Genny's face or neck, defendant said she "couldn't say there were marks on her face" but admitted "she had that little one on her neck." However, defendant could not explain the ligature mark, which she said had been there for about a week. Nor could she account for the marks on Genny's arms, which she said were also about a week old. Defendant had no explanation for why Genny's upper body was not burned in the bathtub.

At this point, the officer questioning defendant told her that Ivan had said he wouldn't take the blame for something defendant had done, and claimed he had spoken to defendant about how she disciplined Genny. Defendant was surprised and upset, and expressed disbelief. However, she quickly asserted that she was not going to be blamed for anything she did not do, and soon began implicating Ivan. She said, "he would hit her too" and "he has a heavier arm than me." Defendant insisted she did not hold Genny in the water, and said, "I can put that on him maybe." Ivan had been in the bathroom a couple of times during Genny's bath, and had spanked her, but defendant "didn't see him do it." Regarding the blow dryer, defendant said she had it in the room while they were trying to revive Genny, and had used it to try to give her some air. She said, "maybe I got it a little too close. 'Cause she was moving. Maybe I did. Maybe I didn't. . . ." When told, however, that the heating element with the grid pattern was in the back of the blow dryer, defendant asserted she could only have touched Genny with the front end.

Defendant admitted that both she and Ivan had put the handcuffs on Genny, to keep her from picking at her wounds. Once, Ivan had put them on her for the entire night. Defendant tried restraining Genny's hands with a cloth tie, but she would free herself. Defendant also admitted that Genny was made to stay in the closet. Ivan put her

9

in the box for punishment. Sometimes she would climb in by herself. Once or twice, she slept halfway in the box, tipped over on its side. Defendant said she and Ivan had tied Genny to the hook in the closet one time, to keep her from falling off the box. Genny had been scraping her head against the ledge around the rim of the box, so they put the lid on the box and made her sit or stand on it. As a form of punishment and to keep her from falling, they tied her to the hook. Defendant said they did this only for two days, a few hours at a time. Then, however, she conceded Genny had spent the night once tied to the hook. When defendant took her down, she saw the mark on her neck.

Defendant maintained that the burn on Genny's head happened while Ivan was away, when Genny climbed up on the stove and reached for a hot pot. When told that the burn was confined to the back of Genny's head, defendant had no explanation. She denied putting Genny under the tap to try to get the bugs out of her hair. Defendant said she did not seek treatment for that burn because she did not have Medi-Cal and was afraid she might be blamed for Genny's scars and abrasions.

Defendant then described how Ivan would hit the children, sometimes with a belt. He hit Genny when she picked at her scabs, or when she yelled. Defendant added, however, that she had hit Genny as well. When pressed about how the fatal burn happened, defendant acknowledged that someone must have held Genny down, but insisted it was not her. She did not see Ivan do it. She also said she had not heard anything, but then remembered that Genny had told Ivan, "please don't drown me." Ivan responded, "you don't tell me what to do." He then went to the store, and about fifteen minutes later defendant found Genny in the tub, burned. Genny was unconscious and sitting up in the tub, but beginning to slide down. When asked about the abrasions on Genny's ears and on the bridge of her nose, defendant had no explanation. Defendant said she knew she should be punished for what happened to Genny. When asked if Ivan should be punished, she said "damn right." She knew she had been charged with murder, but swore she "didn't do it."

10

When she was interviewed earlier on July 22, at 6:25 a.m., defendant was less coherent. At around 10:30 the previous evening, a police officer at the crime scene had reported his suspicion that she was under the influence of methamphetamine, but one of the officers conducting the interview testified that she no longer appeared to be under the influence.[6] Defendant cast aspersions on Mary Rojas, who was her sister and Genny's mother, calling her a "little bitch" and saying she had lost her children because of her drug problems. In a rambling statement, defendant said she had been making dinner, the children were being noisy, Ivan had just gone to the store, and she found Genny in the bathtub, "just laying there." Defendant repeatedly said she did not know what happened.

Defendant told the officers that she had run the bath water for Genny. Genny was on her back, underwater, when defendant found her. The water was warm. She and Ivan tried to revive Genny with the fan and alcohol. Water came out of her mouth when Ivan tried CPR. Genny had burned her head by climbing onto the stove and spilling spaghetti or beans. Defendant made Genny sleep behind the door in a bedroom apart from the other children to keep the other children from picking on her. Defendant could not explain the burn marks on Genny's cheeks, but said they had not been there when she put Genny in the bath. The stains on the wall behind the door were from Genny rubbing her head. Defendant said she and Ivan both spanked Genny when she would do this. Defendant said Ivan had a "heavier hand," but volunteered that she had "never seen him torture her or anything like that."

Asked if Genny rubbed her head on any other walls, defendant acknowledged that she would put her in the closet with the box. Genny would come out when "she started being good." She was put in the closet "maybe three or four days you know just to scare her, you know, just so she could think. . . . But I mean there was no torture there was no I mean no, no, nothing like that." Defendant could not explain the scars on Genny's arms.

---

[6]     Methamphetamine paraphernalia were found in a closet in the apartment.

11

She admitted using a piece of cloth to tie Genny's hands together, and said she also put on "her little bonnet." Genny sometimes went to the bathroom in her pants and refused to take a bath. Defendant made her lie in the bathtub once to scare her, "just to show her ugly butt." Defendant had used the cloth tie on Genny's hands on that occasion, but denied that she or Ivan ever put the handcuffs on her. When pressed about how she tried to correct Genny's behavior, defendant said, "I'm always holding my brush." She admitted hitting Genny with the brush but added, "like actually you know, just torture, torture you know I'm not . . . doing nothing to her like that and I know . . . Ivan's not either because . . . I would see [it]."

Defendant conceded that Genny was badly burned in the bath, and would not have done that to herself, but denied putting her in hot water and insisted she did not know how it happened. She maintained that she found Genny lying in the water, even when told this was inconsistent with the nature of the burn, which could only have occurred if Genny had been held down in the tub. She adamantly denied doing that, and said she did not think Ivan would have done it. Defendant had no explanation for the ligature mark on Genny's neck. Defendant was vague and contradictory about when the bloodstains had appeared on the closet wall, and denied that she or Ivan ever put Genny on the hook. Asked again about the marks on Genny's cheeks, defendant conceded that she had taken the blow dryer away from the children, but denied burning Genny with it. Defendant admitted she had failed to get medical care for Genny when she burned her head, even though she knew it was a serious injury.

### 2. *Defense*

The defense called a forensic pathologist who opined that Genny's burns could have occurred in three to five seconds in 140 degree water, and that she could have died as a result of shock within an hour. He also believed Genny's subdural hematoma could have resulted from a violent shaking in an attempt to revive her.

12

A forensic psychologist with experience in child abuse cases also testified. Counsel introduced videotapes and audiotapes of interviews with defendant's oldest child, Ivan Jr., then questioned the psychologist about the interviews. Transcripts were provided to the jury. The first interview presented at trial was conducted by a detective on the morning after Genny's death. Ivan, Jr., who was eight years old, told the detective that Genny had drowned, and also that she "was taking a warm bath, and I think she, uh, put in hot, . . . and she was laying down in the water and she got burned." He had been in a bedroom with his brothers and sisters, and saw his mother start the bath for Genny. His mother made it warm, but Genny made it hot. After Genny was taken to "the other house" to get help, Ivan, Jr. went into the bathroom, felt the hot water, and drained the tub. He did not hear Genny make any noises in the bath. His mother told him she found Genny lying in the water, and she couldn't breathe.

Ivan, Jr. said he and his siblings would be spanked when they were "real bad," but that Genny was quiet and didn't get into trouble. The detective reminded Ivan, Jr. about the difference between the truth and lies, and encouraged him to be more truthful. Ivan, Jr. said that defendant had put Genny in a warm bath, and then he and his siblings had been locked in their room. He now said he had heard Genny make "a little peeping sound" in the bathroom, like someone saying "ow," four or five times. When his dad unlocked the bedroom door, Genny was in the other house and his dad told them Genny had drowned and was not breathing. Ivan, Jr. admitted he had lied about letting the water out of the tub. He said he had seen the water going down, though, and that his dad told him it was hot.

The next interview was conducted the following day, and was audiotaped. Ivan, Jr. said no one had been playing with the blow dryer the day Genny was hurt, nor did he know if his parents had used it. He did not see the blood on the wall in his parents' closet, and said he never went in their room, except for one time. He did not see a hole in the closet door. Genny would pick at the wound on her head. Ivan, Jr. did not know how

13

the injury happened, though he remembered she had all her hair when she first came to live with them. Genny would be spanked, and sometimes put in the bathtub when she picked her scabs or got dirty.

Ivan, Jr. said he was with his mother when she started the bath for Genny, and the water was warm. When told that his father admitted putting the water in the tub, Ivan, Jr. suggested Genny had taken another bath in the afternoon. He said his father had told him Genny couldn't breathe, and his mother had told him Genny drowned. He didn't remember the scars on Genny's cheeks with the grid pattern, but he did see the wound on her nose. He didn't see the line on her neck.

Ivan, Jr. was interviewed again on July 26, 1995, five days after Genny's death. He was in a foster home by this time. This interview took place at a county facility for children, and was videotaped. The detective began by explaining that he knew Ivan, Jr. had not been telling the truth, and encouraging him not to be afraid and not to tell any more lies. Ivan, Jr. said the last time he saw Genny she was in the bathtub, playing. He could see her through the hole in his bedroom door, which had no doorknob. His mother had put her in the bath. When he heard Genny say "ow" four or five times, he did not look through the hole. He tried to get out but the door was locked.[7] His father opened the door and told the children to stay in the room. Later, he let them out and said Genny couldn't breathe. His mother said the water was hot and Genny drowned.

Ivan, Jr. at first denied hearing his mother screaming and yelling, even when told his brother and sister said she did. When pressed about telling lies, he said he was scared. He then admitted that his mother had screamed, after Genny said "ow" and before his father came to tell them to stay in the room. He also said Genny, like all the children, was spanked and hit with a belt, a broom, or a plastic bat. She slept behind the door in

_____

[7]    A sliding lock was installed on the outside of the door. The hole where the doorknob would have been afforded a view of the entire bathroom if the bathroom door was open.

14

the other bedroom, and sometimes in the closet.  Ivan, Jr. never saw handcuffs on Genny, but her hands were tied with rope or cloth to keep her from picking her wounds.  He never saw the hook in the closet, or Genny being hung in the closet.  He did not know how she had burned her head, or how she got marks on her ears.  Ivan, Jr. was unable to explain what he had meant when he said he was scared earlier in the interview.  He said he thought the police would punish him if he did not tell the truth.

Next, the defense played a videotape of an interview conducted by a district attorney on October 25, 1995.  Ivan, Jr. said he was going to be nine in December.  On this occasion, he made some rather dramatic new statements.  He volunteered that his parents had made Genny eat her own excrement.  He said Genny would not eat every day, because his parents wanted to get rid of one of the children, and she was going to be the first.  His parents spent their money on drugs instead of food, and had too many kids.  They were torturing Genny, hitting her and cutting her skin off.  Ivan, Jr. said they would cut her skin with a knife, "and you could see her meat and her blood."  Both parents would do this, all over Genny's body.  Genny's hair was missing because his parents pulled it out.  Genny would scream, and his parents would hit her, punch her, "throw her in the bathtub . . . and get the knife and cut all her skin off."

Ivan, Jr. said that on the night Genny died both his parents had put her in the bath.  Genny kicked the water and tried to fight back, but she was weak.  Ivan, Jr. said he knew the water was hot because "they would always put hot water."  When he looked through the hole in his bedroom door, his parents had closed the door to the bathroom, but he knew they had put her in the bathtub because "they would always do that."  His dad said Genny had drowned, but Ivan, Jr. thought they had killed her instead.  He had gotten some alcohol from a neighbor, and his mother poured it over Genny.  However, Ivan, Jr. then said this was before Genny had taken her bath, and Genny had been in the children's bedroom when his mother poured the alcohol on her.

15

When asked if he had seen anything hanging in the closet, Ivan, Jr. said his parents had tied Genny to a metal thing and left her hanging, with her hands tied together. This happened a lot, and Genny would be left in the closet for "four hours or something." His parents had made the children throw a hard ball at Genny, but Ivan, Jr. would "keep throwing it crooked." His parents would not give Genny food, and when she asked for it they would put hot sauce on it. The children made Genny a sandwich, and were punished for doing so. The district attorney explained that he would be asking Ivan, Jr. questions in court soon, and encouraged him to tell the truth.

Finally, the defense played videotapes of Ivan, Jr.'s testimony at the preliminary hearing, which took place on November 8, 1995.[8] Ivan, Jr. said that Genny had slept in his parents' bedroom both behind the door and in the closet, and also in the bathtub. His parents put her in the tub with her hands and feet tied. Her hands were also tied with rope when she slept in the closet. On the night Genny died, Ivan, Jr. was locked in his room with his brothers and sisters. He saw Genny in the tub when he looked through the hole in the door. At a later point, he heard Genny screaming and crying, but he did not look through the hole then. He also heard his mother scream, after he heard Genny. His father then unlocked the door, asked the children to stay in their room, and locked the door again.

Ivan, Jr. said that when Genny first came to live with them, she had no marks on her face and she had all her hair. She lost her hair when his parents burned her and pulled it out. They had burned her with hot water in the bathtub, a long time before the night she died. Ivan, Jr. had seen his parents in the bathroom on that occasion, looking through the hole in his door. Genny lay down in the tub, and his mother helped his father hold her down. The hot water came out of the spout and onto her head. She was crying and

---

[8] Ivan, Jr. did not testify at defendant's trial. A single preliminary hearing was held for defendant and her husband, but their cases were later severed. Ivan was tried first, convicted, and sentenced to death. The same judge presided over both trials.

16

screaming. Ivan, Jr. saw this "a lot of times." When Genny would rub her head against the wall, his parents would hit her with a belt. Ivan, Jr. said Genny did not have accidents going to the bathroom, and was potty trained.

Ivan, Jr. testified that he and his brothers and sisters ate in the kitchen, but Genny ate in his parents' room. He said "she only ate a couple of times." He and his siblings gave Genny food, but his parents hit them when they found out about it. They also made the children throw balls at Genny. One of the balls was hard, but it was not heavy. Ivan, Jr. had once seen Genny hanging in the closet, "and she was in a basket." Her hands were tied, and she was hanging without her feet touching the ground.

On cross-examination by defendant's counsel, Ivan, Jr. said that both his parents were "the boss of the house." If they disagreed, his mother would usually get her way, "because she's the girl and my dad's not." He also said he thought his mother was afraid of his father, because his father was stronger and would hit her when they got into fights. On cross-examination by his father's counsel, Ivan, Jr. again said his mother usually got her way, and that she often told his father what to do. Sometimes he would do it.

Defendant's psychological expert noted the strikingly different statements Ivan, Jr. had made in his fourth interview, on October 25, 1995. He pointed out that the interviewers did not challenge the new statements about his parents cutting off Genny's skin, and forcing her to eat feces. It was possible that at first Ivan, Jr. had tried to protect his parents, but became more comfortable as time passed. He might also have been influenced to change his story. The psychologist had reviewed the notes and testimony of Ivan, Jr.'s therapist and his social worker. He observed that neither had done a forensic interview, that it was not their role to challenge the boy's accounts, and that neither controlled for contamination of his recollections by outside influences.

Defense counsel called the therapist, Edna Lyons, and the social worker, Karen Oetken. Their testimony was consistent with the observations of the psychologist. Lyons, who began seeing Ivan, Jr. in August, 1995, had not reviewed any of the tapes of

the interviews with him. Her notes indicated that Ivan's first statement about Genny's treatment in the home was on October 10, 1995. He said his parents had hit Genny, and when she pooped in the tub, they would put the poop up to her mouth. In advance of his preliminary hearing testimony, he told Lyons he was worried about seeing his parents, who hit him, and afraid that when he told the truth they would shout that he was lying. However, he felt safe because police would be present.

Oetken testified that she had interviewed Ivan, Jr. on July 24, 1995, not long after Genny's death. She asked him what had happened. He said Genny had drowned, and couldn't breathe. He did not hear her cry, but she had said "ow." The other children were in the bedroom, and the parents in the living room. His mother checked on Genny and found her in the water. His parents had told him this. He did not think his parents had hurt Genny. On August 1, Oetken spoke to Ivan, Jr. in a foster home. He told her that Genny had rarely come out of his parents' bedroom, and he asked if she had died. He was sad when told that she had. On August 2, Oetken interviewed defendant, who said that she had been molested by her stepfather as a child, and that her husband was abusive to her but good to the children. Genny soiled her pants and would not listen. Defendant said she spanked Genny with her hand and a belt but did not hurt her. The children also hit Genny. On August 11, Ivan, Jr. denied hitting Genny.

Oetken attended the preliminary hearing, and made a note of Ivan, Jr.'s courage in testifying. She also noticed that his testimony differed from the things he had told her about what happened to Genny. The next time she spoke to Ivan, Jr., she asked him if anyone had told him what to say at the hearing. He said no.

The defense called Cynthia Bernee, a marriage and family therapist with experience in cases of domestic violence. She described battered woman syndrome.[9]

---

[9]     The jury was instructed that the battered woman syndrome evidence was offered for the limited purpose of providing a potentially innocent explanation for defendant's

18

Defendant then took the witness stand, and denied that she killed, tortured, maimed, burned, beat, hung, or disfigured Genny. Under counsel's questioning, defendant then provided a lengthy description of her childhood and her marriage. Her stepfather had sexually molested her when she was a child. When she was 15 years old, she reported the molestation, and a dependency court proceeding was initiated. She was placed in a guardianship with her older sister, but her stepfather was never prosecuted. Defendant's mother drank and was verbally and physically abusive. She yelled at defendant, slapped, hit, and kicked her, pulled her hair, forced her to stand with her sister on newspaper that she then set on fire, and made her kneel in the backyard in the sun holding bricks. Defendant met Ivan when she was 15 years old and they married when she was 16. She soon became pregnant, and he began to be abusive and controlling. She tried to leave him, but he threatened her and the children and said he would kill himself. He sexually abused her.

Defendant testified that both she and Ivan used marijuana and crystal methamphetamine. In 1994 and 1995, the drug use became heavy. Ivan had not worked for years, and they used their welfare payments to buy drugs. Ivan was abusive to the children, yelling at and hitting them. Defendant admitted spanking the children with her hand, a belt, and a brush. She also admitted to an affair with Eugene Luna, Jr., a co-worker of Ivan's. She told Ivan about the affair and briefly separated from him, but he persuaded her to come back. At the time of Genny's death, the family's apartment was dirty and the children had lice. Defendant said these conditions resulted from her drug use and from being overwhelmed by trying to cope with Ivan and the children.

When her sister Mary's children were being considered for placement with defendant's mother, a social worker contacted defendant to ask if the molestation allegations she had made against her stepfather were true. She said they were not. Her

failure to protect Genny or to provide medical care for her, and to provide a context for defendant's statements after Genny's death.

19

mother had asked her to recant so that her mother could keep the children. Genny came to live with defendant at the end of January, 1995. Earlier, she had lived with defendant's sister Anita for a while. Defendant took Genny because her mother was having difficulty with the children. Ivan agreed, after defendant's mother promised to give them a hundred dollars a month. However, her mother did not make those payments. Defendant's family was under financial stress. Their welfare payments were to end, their rent rose, and sometimes the electricity was cut off. Sometimes they ran out of food. Still, she and Ivan spent money on drugs.

Defendant testified that Ivan abused Genny the same way he abused his own children. After Genny burned her head, the abuse got worse. Ivan had taped Genny's hands and burned her head with hot water in the bathtub, in a rage because she had spilled his marijuana. Defendant wanted to take Genny to the doctor, but Ivan would not let her. She called a 24-hour nurse and said Genny had been burned with a pot of hot water, because Ivan told her to say that. She tried to care for the burn as best she could. Ivan hit and kicked Genny and kept her in the parents' bedroom, apart from the other children. He tied Genny's hands with bootlaces, and used handcuffs on her. Defendant herself used a cloth tie on Genny's hands, but it did not keep her from scratching herself. Genny got less to eat after Ivan started keeping her in the bedroom.

Defendant did not report Ivan's abuse of Genny because she was afraid of him. On one occasion, she found Genny tied up in the closet, standing on the box and tied to the closet pole by a cloth around her waist. Defendant took Genny down. When she asked Ivan why he was doing this, he became angry with her. Defendant thought about returning Genny to her family, but Ivan did not want anyone to find out what he had done to her, and her mother was not ready to take Genny back. Defendant found Genny hanging in the closet a second time, after defendant awoke from a drug-induced stupor. The cloth was around Genny's neck, her face was swollen and red, and there was a mark on her neck when defendant took her down. She and Ivan fought physically on this

20

occasion.  Defendant had tried to protect Genny's head by fashioning a bonnet out of a pant leg and a hairband.  She said the bonnet had not caused the abrasion on Genny's nose.  She did not know how that injury occurred.

Defendant and Ivan had been up for two or three days, using methamphetamine, on the day Genny died.  That afternoon, a grocery store owner had confronted Ivan at the apartment about an unpaid bill, which made Ivan angry.[10]  Defendant began cooking dinner in the evening.  She interrupted the preparations to draw a warm bath for Genny, and put Genny in the bath.  She went back to the kitchen, and on her way saw Ivan lock the other children in their room.  Then she heard Ivan in the bathroom, yelling at Genny to hurry up.  He came out and asked defendant to make some lines of methamphetamine. Defendant went into a closet to do this.  Ivan began yelling at Genny again.  From inside the closet, defendant heard Genny tell Ivan, "please don't drown me."  Then, defendant heard Genny scream.  Defendant went to the bathroom, and saw Ivan holding Genny down by the shoulders, with her arms on the side of the tub.  Defendant yelled at Ivan, he let go of Genny, and defendant picked her up.

Genny seemed to be unconscious.  Defendant carried her into the parents' bedroom.  Defendant was screaming.  Ivan told her to shut up, and closed the window. He told defendant to get a fan, and said he would do CPR.  He began blowing in Genny's mouth, but she did not move or make a sound.  Defendant believed Genny was dying, and "wanted so bad for her to come back."  Ivan said he was going to the store, and told defendant to stay there and not tell anyone, because they would blame her and only he knew what had happened.  He left, and defendant stayed with Genny.  She thought he might be getting help.  When Ivan returned with bread, beer, and cigarettes, defendant was angry and went to Patti's apartment to get help.

---

[10]     Juan Banuelos, the store owner, testified and confirmed that he had visited the apartment that day in an attempt to collect the bill from Ivan.

21

Defendant claimed she said "don't call the cops" at Patti's because Ivan had told her that, and because she wanted to get help for Genny, not contact the police. Ivan also told her to say that Genny had drowned, and that her head was burned by a hot pot. Defendant said she had lied during her interviews with the police. She was shocked, confused, and too afraid of Ivan to tell the truth. During the first interview, she was under the influence of methamphetamine. During the second interview she was not, but she was confused, unable to think for herself, and afraid that Ivan would get out and hurt the kids. She could not account for all the scars on Genny's body, because she had not been there when they were inflicted. Defendant said Genny did not have the blow-dryer burns before she took her last bath. Defendant had left Genny alone with Ivan, however, while she paced around the apartment after pulling Genny from the bathtub.

Defendant testified that she had seen Ivan a few times since their arrest when they were being transported to juvenile court and to the criminal proceedings. He told her that he loved her, and to stick to the story he had told her. Defense counsel introduced into evidence 26 pages of correspondence Ivan had sent to defendant while they were in jail. Ivan had tried to persuade her to fire one of her attorneys. On one letter, he had written "if it comes right down to it," beneath which he drew a face labeled "me" with a finger pointing toward it. Defendant said this diagram meant that Ivan was telling her what to say. She said he used his finger "as a sexual thing, and it implies that, too." Defendant believed Ivan was trying to get her to fire her attorney because the attorney wanted her to blame Ivan. Most of the correspondence, however, was about sex and how much he loved her. At first it felt good to hear this, but then she realized he was trying to get her to do what he wanted her to do.

The defense called a series of witnesses who were friends, family members, or neighbors of defendant's. Counsel questioned them about defendant being abused by her mother and stepfather when she was a child, and by her husband during the marriage. Victor Negrette, the husband of defendant's sister Anita, testified about the months when

22

he and Anita had custody of Genny before returning her to defendant's mother. He said Genny was undisciplined and would throw tantrums in stores if they did not buy her what she wanted. He had told Anita that Genny "needed professional help," and ultimately decided they were financially incapable of caring for her. They had seen Genny once after she moved in with defendant's family, and she seemed healthy and happy. Anita also testified. She too mentioned Genny's misbehavior in stores, and her good condition when they visited defendant's home.

A doctor specializing in addiction testified about methamphetamine abuse and its effects. The defense then called Kenneth Ryan, a psychologist with experience counseling battered women, who testified about battered woman syndrome and his evaluation of defendant. He had interviewed defendant many times while she was in custody, and had given her the MMPI (Minnesota Multiphasic Personality Inventory) twice. He concluded that the first test, administered in September 1995, was invalid because defendant's responses were characteristic of a subject who is lying. The second test, conducted in February 1997, also reflected a high score for falsity, but not so high as to automatically invalidate the test results. This test showed that her self-esteem had been improving. Ryan believed defendant suffered from posttraumatic stress disorder and battered woman syndrome. He observed that it is characteristic of a battered woman to fail to protect children in her care. Furthermore, a battered woman will lie to protect her batterer, and accept responsibility for the actions of the batterer.

Following the psychologist's testimony, the defense recalled Cynthia Bernee, the therapist who had testified generally about battered woman syndrome. Bernee gave her opinion that defendant was a battered woman. She testified that a battered woman may accept responsibility for the batterer's abuse of a third party, such as a child.

3. *Rebuttals*

The prosecutor called a number of witnesses on rebuttal. Eugene Luna, Jr., the co-worker of Ivan's who had an affair with defendant, testified that she had initiated the

23

encounter. He had seen defendant throw a plate at Ivan on one occasion, and from his observations of their relationship he believed defendant "had the upper hand." Luna also related an incident when defendant, intoxicated after a party, threw a temper tantrum in a parked car with Ivan, Luna, and some of the Gonzales children present. Defendant was screaming incoherently and kicking the dashboard. Neither Ivan nor Luna could calm her down, and witnesses called the police, who took defendant into custody.

Luna's father testified. He had socialized with defendant and Ivan over a period of four or five years, and he also deemed defendant the "boss of the apartment." He had seen her hit Ivan in the mouth. She would tell Ivan what to do, and he would usually do it. If he did not, she would curse at him and push him. The wife of the grocery store owner who visited the apartment on the day of the murder testified that she had seen defendant and Ivan in the store together about eight times. Defendant seemed to be in charge of the relationship; she told Ivan what kind of cigarettes he could buy, and he would stand behind her watching the children.

Rosemarie Price, a childhood friend of defendant's who was Ivan's cousin, testified that she had introduced Ivan to defendant. On one occasion, defendant had shown Price some papers relating to her molestation claim against her stepfather. Defendant did not seem embarrassed, and snickered when Price asked why she had not told her about it before. Lorena Peevler was a friend of Ivan's, with whom defendant and Ivan had lived for a period of months in 1990 or 1991. Peevler said the two fought a lot. Defendant blamed the conflict on Ivan's mother. Defendant would push and scratch at Ivan and threaten to leave; he would not retaliate and pleaded with her to stay. After they moved, Peevler visited defendant and they talked. She did not complain about abuse by Ivan. Peevler felt defendant was the boss of the relationship. Ivan's sisters, Patricia Andrade and Guadalupe Baltazar, testified to the same effect. Baltazar had visited the apartment in early July, and saw the burn on Genny's head. Genny had no other scars at that time.

24

Mark Mills, a forensic psychiatrist, testified for the prosecution. The court had ordered defendant to submit to an evaluation by Dr. Mills. She refused on the advice of counsel, as the jury had learned during her testimony. Dr. Mills had reviewed the videotaped interviews of defendant, and transcripts of her trial testimony. He offered no clinical or forensic opinion, but gave his opinion on three issues. First, Mills said the fact that defendant faced the death penalty provided a motive for malingering, i.e., a conscious attempt to deceive psychological evaluators about her mental state. Second, he opined that if defendant had posttraumatic stress disorder, it did not interfere with her ability to perceive reality or vitiate her free will. Finally, Mills believed the inconsistencies in defendant's various accounts of events in her life made it impossible to reliably conclude that she had posttraumatic stress disorder.

Defendant did submit to an evaluation by the other mental health expert called by the prosecution, Nancy Kaser-Boyd. Kaser-Boyd, a psychologist, met with defendant over the course of two days for around 15 hours, seven of which were spent on testing. Defendant communicated well and Kaser-Boyd estimated her intelligence as "certainly average and probably above average." Defendant's test results were inconsistent with those usually obtained from battered women, and consistent with those of a subject who is exaggerating her symptoms. Kaser-Boyd reviewed the second MMPI test given by Ryan, the defense psychologist, going over the answers with defendant and making corrections. On this test, which showed some exaggerated features but was within the range of a valid profile, defendant's scores were elevated in categories reflecting a tendency to act out angrily in socially unacceptable and irrational ways. This was not the typical profile of battered women.

Kaser-Boyd testified that defendant's account of Ivan's spousal abuse did not approach the level of violence at which women are immobilized by terror and unable to come to the aid of an abused child. Kaser-Boyd found it difficult to say whether defendant did suffer from battered woman syndrome, due to her tendency to exaggerate

25

and to give inconsistent accounts of the traumatic events in her life.  Kaser-Boyd found it "completely illogical" to conclude that defendant had been protecting Ivan in her statements to the police, when she implicated both him and herself in Genny's abuse.  Kaser-Boyd agreed with Ryan that defendant suffered from posttraumatic stress disorder.  She deemed it a complex, chronic form of the disorder that could have resulted from defendant's childhood experiences alone, though being a battered woman might have contributed.

On surrebuttal, the defense called another expert psychologist, Thomas Mac Speiden.  He had given defendant an intelligence test and a reading achievement test.  Defendant's intelligence was in the low average range, and her reading ability was that of a beginning eighth grader.  The tests given by Ryan and reviewed by Kaser-Boyd required an eighth grade reading level.  Mac Speiden believed the profile derived by Kaser-Boyd from the second MMPI test was flawed because she had only reviewed certain answers with defendant.  Mac Speiden found the validity of this test highly questionable.  He also believed Hispanics were underrepresented during the test standardization process, so that the results might reflect a cultural bias.

B.  *Penalty Phase*

The prosecutor presented no additional evidence at the penalty phase.  The defense presented witnesses who related defendant's exemplary conduct and religious observance in jail.  Employees of the social services department testified about defendant's supervised visits with her children.  Ivan, Jr.'s therapist said the boy's psychological problems would be exacerbated if his mother were given the death penalty.  A therapist for defendant's son Michael gave similar testimony.

Defendant's sister Anita testified about the effect a capital sentence would have on the family, as did Anita's husband Victor and their sons Victor, Jr. and Gabriel.  Genny's mother, Mary Rojas, described the abusive environment she and defendant grew up in, and the drug problems that led her to lose custody of her children.  Although Genny's

26

death was very difficult, Rojas said her family would be hurt again if defendant were given the death penalty. Rojas's substance abuse counselor testified about the progress she had made in treatment.

## II. DISCUSSION

### A. *Guilt Phase*

#### 1. *Claims Regarding the Battered Woman Theory*

Defendant's first argument is convoluted and diffuse. She contends a variety of improprieties permitted the prosecutor to insinuate that defendant and Ivan had each agreed to blame the other for Genny's death. However, the actual claims she advances under this heading are more accurately characterized as challenges to various aspects of the prosecutor's rebuttal of defendant's claim that she suffered from battered woman syndrome. We address each claim separately, in the order defendant makes them.

##### a. *Cross-examination on Ivan's Defense*

Defendant asserts the prosecutor committed misconduct when cross-examining her regarding a letter in which Ivan tried to persuade her to fire her attorney. At the end of this letter, Ivan had drawn a diagram of a face labeled "me" with a finger pointing to it, below the statement "if it comes down to it." Defendant maintained the position she had taken on direct examination, that the letter reflected Ivan's attempt to control her, and the diagram referred to his practice of using his finger for sexual purposes. The following exchange occurred:

"Q: Well, you knew that Ivan Gonzales claimed he was a battered man, didn't you?

"A : He never testified to that; no, I didn't.

"Q: He didn't testify to it, but he claimed that, didn't he?"

Defense counsel objected, on the ground that the question had been asked and answered. The court sustained the objection "on the grounds that we shouldn't go through with that line." Nevertheless, the prosecutor proceeded to ask defendant, "well,

were you aware that that was his defense?" Defense counsel objected and asked for a sidebar conference. The court agreed.

Out of the jury's presence, the court noted that "we've tried to stay away from what happened at Ivan's trial altogether, and this is asking about what happened at Ivan's trial." The court also pointed out that "Ivan, as far as I know, didn't do anything but enter a plea of not guilty and deny the special circumstances. All the things that she might answer about are things his attorneys did . . . I'm not so sure I see how relevant that is." The prosecutor explained that he was trying to dispute defendant's claim that Ivan was manipulating her. The court noted that defendant's attempt to characterize the drawing as anything other than an invitation to cast blame on Ivan was weak, and did not justify drawing the jury's attention to what Ivan's position at his trial had been. It stated: "I'm inclined to sustain the objection and to find that we ought to stay away from anything about what happened at Ivan's trial."

Defense counsel moved for a mistrial, arguing that the prosecutor had created the impression that the battered spouse defense was "bogus" because Ivan as well as defendant had asserted it. Counsel noted that Ivan in fact raised no such defense at his trial. If a mistrial were denied, counsel asked the court to permit him to introduce statements Ivan had made in his interviews with the police, admitting that he had put Genny in the bath. The court denied the motion for a mistrial, and agreed to consider remedial measures at a later time. It granted defense counsel's request for an admonition telling the jury not to consider counsel's questions as evidence, and in particular not to consider the question when an objection was sustained.

At the next break in the proceedings, the court brought up the question of how the defense might respond to the prosecutor's questions, suggesting that perhaps on redirect the defendant could testify she was unaware of any attempt by Ivan to blame her for what happened to Genny. Defense counsel noted that Ivan's defense was indeed that defendant was responsible for what happened, although Ivan himself never directly

28

blamed her. In any event, counsel declined the court's invitation to explore defendant's knowledge on this subject, saying it would open "more cans of worms."[11]

Defendant argues that the prosecutor committed intentional misconduct by questioning her about Ivan's battered spouse defense. "The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.] 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

Here, defendant did not object on grounds of misconduct, and the court did admonish the jury to disregard the prosecutor's questions. In any event, while it was improper for the prosecutor to persist with his line of questioning after the court sustained an objection, this conduct did not amount to the kind of " 'deceptive or reprehensible' " tactic that rises to the level of prosecutorial misconduct. (*People v. Friend*, *supra*, 47 Cal.4th at p. 29.) On direct examination, defendant had offered her interpretation of Ivan's letter as an example of his continuing efforts to dominate and control her. A claim

---

[11] Counsel pressed his argument that he should be allowed to present Ivan's incriminating statements, but the court declined to hear the argument at that time. Later in the trial, defense counsel reminded the court that it had not ruled on this point. The court heard from both sides, and decided that no door had been opened to bring in Ivan's statements. We discuss the admissibility of these statements *post*, in part II.A.1.d.

29

by Ivan that he was battered by defendant would have tended to rebut that theory. There was at least some factual basis for the prosecutor's suggestion. Defendant had been present in pretrial proceedings when Ivan's attorney announced his intent to employ a battered spouse defense, though ultimately he decided not to. While the question positing "that was his defense" was misleading, there was no opportunity to clarify the issue because an objection was sustained. The jury was reminded that statements in the attorneys' questions were not evidence. Defense counsel did not ask the court to inform the jury that Ivan did not actually claim that he was a battered spouse.

Defendant contends the court erred when it denied her request for a mistrial. We disagree. "In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. [Citation.] 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) Here, the court did not abuse its discretion by concluding that an admonition was sufficient to cure any prejudice stemming from the prosecutor's questions.

b. *Cross-examination on Expert Opinion*

The matter of conflicting expert opinions on whether Ivan was a battered spouse first surfaced in a hypothetical question posed by the prosecutor when cross-examining Cynthia Bernee, defendant's expert on battered woman syndrome. During Bernee's initial testimony, before defendant took the stand, the prosecutor asked Bernee to assume that a husband and wife were both involved in a crime, both claimed to be a battered spouse, both had expert opinion supporting that claim, and the prosecution had experts saying that neither spouse suffered from the syndrome. He then asked, "what's a jury supposed to do?" The court sustained a defense objection on the ground that the question was outside the witness's expertise. The prosecutor proceeded to ask, "how would you

30

expect a jury to evaluate a situation like that?" The court again sustained a defense objection.

The matter was squarely raised later, when the prosecutor sought permission to cross-examine defense experts about the existence of two reports, one by a Dr. Weinstein concluding that Ivan was a battered spouse, and one by Dr. Mills, the prosecution expert, concluding that he was not. The prosecutor proposed using these reports for two purposes: showing that expert opinion on this subject was unreliable, and showing that an expert believed Ivan was a battered man, which would rebut the defense position that any violence by defendant against Ivan was merely counter-violence consistent with her status as a battered woman.

Defense counsel objected strenuously. Among other claims, counsel argued that the reports on Ivan were irrelevant, would bring in hearsay, and would prejudice the defense because it would be unable to meet the evidence by disputing the conclusion that Ivan was a battered man. Ivan was not available to defense experts for examination. The court observed that the scope of cross-examination of an expert is broad, and the critical issue was whether the reports were more prejudicial than probative under Evidence Code section 352. The court noted that the prosecutor might use the reports to show that experts reach different conclusions on battered spouse syndrome; to show that the defense experts ignored the reports on Ivan, if that were the case; and to show that Ivan was not a batterer. However, the latter point depended on hearsay. On the other hand, the court reasoned that the reports on Ivan would distract the jurors from their focus on defendant; confuse them because the prosecutor did not contend that Ivan was a battered man; consume undue time if the substance of Dr. Weinstein's opinion were allowed in; and prejudice the defense due to its limited opportunity to challenge the conclusion that Ivan was a battered man. If the prosecutor were to cross-examine the defense experts with the substance of that conclusion, the court thought it would be hard for the jury to follow a limiting instruction telling them not to consider it.

The court proposed a middle ground, allowing the prosecutor to simply ask the defense experts if they were aware of the conflicting reports, one finding that Ivan was a battered man and the other that he was not, without including any details. The court would then instruct the jury that the reports could be considered only on the reliability of expert opinion in this area, not on the factual question of whether Ivan was either a battered man or a batterer. The prosecutor was amenable. The defense objected, and the matter was argued at length. Defense counsel agreed with the court that prejudice was the determinative issue under Evidence Code section 352. As to conflicting expert opinion, counsel noted there were already conflicting experts in this case, so the prosecutor did not need the reports on Ivan to make that point. It would be very difficult for the defense to rebut Dr. Weinstein's conclusion that Ivan was a battered man, or for the jury to put it aside and follow a limiting instruction. Indeed, allowing the prosecutor to tell the jury that experts reached different conclusions on Ivan's status was no middle ground at all, but exactly what the prosecution wanted, because it would both cast doubt on the defense experts and present the substance of Weinstein's report. Counsel argued that if Weinstein's opinion came before the jury, the defense was entitled to rebut it by bringing in statements by Ivan that Weinstein had considered.

The court asked whether the prosecutor intended to argue that Ivan was a battered man. The prosecutor said he did not. His position was that it was simply a case of mutual violence between the spouses. The court, noting that it had devoted a significant amount of time to this issue, ruled that the prosecution could use the reports on Ivan for the limited purpose of showing that they differed on his status as a battered man. The court saw no prejudice to the defense, because neither party would be arguing that Ivan was a battered man, and a limiting instruction would tell the jury to consider the reports only on the question of the reliability of expert opinion on battered spouses, not as to whether Ivan actually was a battered spouse. Because of that limitation, the court refused to permit defense counsel to go into the basis for Dr. Weinstein's opinion.

32

During his cross-examination of Ryan, the defense psychologist, the prosecutor asked if Ryan was aware of conflicting opinions on Ivan, one that he was a battered man and one that he was not. Ryan said he was aware of them. The court instructed the jury: "The doctor has testified to other opinions that he is aware of with regard to Ivan Gonzales. You are allowed to use that and consider that only for a limited purpose. You are allowed to consider it only for the limited purpose of considering the reliability of such expert testimony in this area in general. You are not to consider it on the question of whether Ivan Gonzales is or is not a battered person. I emphasize to you that you are to decide only Veronica Gonzales's issues in this case. It is her status, her case, that is before you. In this case, both sides will be arguing to you at the end of the case that Ivan Gonzales is not a battered man. So the reasons for your not considering it on that issue are obvious and, I think, clear to you."

Defendant contends the court abused its discretion in weighing the prejudicial and probative impacts of the reports, and violated her federal Fifth, Sixth, and Fourteenth Amendment rights to present a defense by precluding defense counsel from exploring the bases of Dr. Weinstein's opinion that Ivan was a battered spouse.[12] The question is a close one, as the trial court recognized. The scope of cross-examination of an expert witness is especially broad. (*People v. Lancaster* (2007) 41 Cal.4th 50, 105.) Evidence that is inadmissible on direct examination may be used to test an expert's credibility, though the court must exercise its discretion under Evidence Code section 352 to limit the evidence to its proper uses. (*People v. Stanley* (1995) 10 Cal.4th 764, 833.) Experts who testify regarding a mental condition may be questioned regarding their awareness of other

---

[12]    Defendant also contends the hypothetical posed by the prosecutor to Bernee, regarding conflicting expert opinions, amounted to misconduct. However, defendant did not preserve this claim below; counsel argued only that the question "border[ed] on misconduct." Even if the objection had been made, the prosecutor's questions were not a deceptive tactic that injected incurable unfairness into the trial. (*People v. Friend*, *supra*, 47 Cal.4th at p. 29.)

inconsistent opinions by similar experts. (*People v. Montiel* (1993) 5 Cal.4th 877, 923-924.)

Here, there is some merit in defendant's claims. The probative value of the opinion evidence was minimal. The fact that conflicting opinions had been obtained specifically on Ivan's status as a battered man carried little weight for the very limited purpose the court allowed, i.e., determining the general reliability of expert opinion on battered spouse syndrome. There were already conflicting opinions in defendant's case. Ryan readily conceded that experts could differ, even before the prosecutor questioned him about the opinions on Ivan. Moreover, the court permitted the jury to weigh the fact that an expert had deemed Ivan a battered spouse, yet barred defendant from exploring the bases for that opinion.

Nevertheless, any error was plainly harmless. A trial court's determinations under Evidence Code section 352 do not ordinarily implicate the federal Constitution, and are reviewed under the "reasonable probability" standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. Assuming defendant has a cognizable federal constitutional claim here, we would also find the error harmless beyond a reasonable doubt under the standard prescribed in *Chapman v. California* (1967) 386 U.S. 18, 24. Our reasons are several.

First, the battered woman theory put forward by the defense was damaged far more seriously and directly by other evidence than by the conflicting expert opinions on Ivan's status. A number of witnesses, including those who knew the family well, like the Lunas and Lorena Peevler, testified that defendant was the dominant spouse in the relationship. The wife of the grocery store owner confirmed that impression with her testimony regarding the spouses' behavior in the store. Ivan, Jr., in testimony presented by the defense, said his mother was more likely than his father to get her way. Most tellingly, defendant's responses in the July 24 police interview were flatly inconsistent with the notion that she was intimidated by Ivan. When told that he had blamed her, defendant displayed anger and surprise, and promptly began implicating him, along with

34

herself, in the prolonged and varied course of abuse that led to Genny's death. She did not suggest she had been acting under Ivan's control, and her statements certainly did not reflect an effort to protect him. Although she indicated at times that Ivan had hit her, she more frequently described blows he inflicted on the children. At the end of the interview, she emphatically agreed that Ivan should be punished for what had happened to Genny. Defendant's statements and demeanor were quite incompatible with the defense theory that she was the cowed victim of a battering husband. The defense experts' attempts to explain away her performance during this videotaped interview were feeble. Compared to the powerful videotape evidence of defendant's interview, and the testimony of witnesses who knew the couple well, the impact of conflicting opinion evidence on whether Ivan was a battered spouse was minimal.

Second, the prosecutor did not dwell on the opinion evidence. Even including his earlier unsuccessful attempts to bring up the idea that Ivan claimed to be a battered man, in the hypothetical posed to Bernee and the cross-examination of defendant on the letter she received from Ivan, no great emphasis was placed on this factor. In closing, the prosecutor mentioned it only as an example of the unreliability of expert opinion in the fields of psychology and psychiatry.

Finally, the battered woman theory was not a defense to the crimes charged against defendant. The jury could have believed she was a battered spouse, yet also decided that her failure to protect Genny and her participation in severe acts of child abuse were criminally culpable. Indeed, the abuse of Genny was so horrific, and so much worse than any of the spousal abuse defendant claimed to have suffered, that the jury was highly likely to hold her responsible even if it accepted the battered woman theory. For all the above reasons, we have no doubt that the result of the trial would have been the same had the court refused to permit the prosecutor to impeach Ryan with the conflicting expert opinions on Ivan's status as a battered man.

35

c. *Requiring Defendant to Submit to Interviews with Prosecution Experts*

Before trial the prosecutor moved for an order directing defendant to submit to a psychiatric evaluation by a prosecution expert, if she produced expert testimony of her own about her mental condition. The motion was based on *People v. Danis* (1973) 31 Cal.App.3d 782 (*Danis*) and Evidence Code section 730, among other authorities. Defendant opposed the motion, claiming she was not presenting a defense based on her mental condition but instead offering battered woman syndrome as an explanation for certain of her actions, such as failing to protect Genny and lying to the police. The court issued a tentative ruling that the prosecution's request was proper under *Danis*.

The parties argued the matter on several occasions. The prosecutor noted that the defense would be calling Bernee, a marriage and family therapist, as well as Ryan, a psychologist. He asked that two prosecution experts be allowed to examine defendant, Kaser-Boyd and Dr. Mills. He said Kaser-Boyd would testify on battered woman syndrome, and Mills on more general psychiatric issues. The prosecutor described Dr. Mills as a "debunker." The defense, in addition to maintaining that no examination should be permitted, objected to the idea of more than one examiner and particularly to an examination by Dr. Mills. Counsel argued that Dr. Mills had no expertise in battered woman syndrome, and that his views of defendant would be colored by his examination of Ivan before Ivan's trial. Moreover, the defense would be at a disadvantage because it had no opportunity for an expert to examine Ivan. The court granted the prosecutor's request. It saw no legal obstacle to examinations by two experts, and found it reasonable for one to examine defendant with regard to battered woman syndrome and one to determine more generally whether other mental conditions might explain her behavior. The court also saw no reason why Dr. Mills should not be one of the examiners, though it was inclined to exclude any statements Ivan had made to Mills.[13]

---

[13]    Defendant's writ petition challenging the court's order was denied.

36

Defendant was examined by Kaser-Boyd, but refused to submit to examination by Dr. Mills. The defense was aware that a consequence of that refusal was that the jury would be told it could consider her decision in its evaluation of the expert testimony. At the conclusion of the guilt phase, the court advised the jury that it had ordered examinations by Kaser-Boyd and Mills, that defendant had refused to be examined by Dr. Mills, and that her refusal "may be considered by you when weighing the opinions of the defense experts in this case. The weight to which this factor is entitled is a matter for you to decide."

Defendant raises a number of claims of error regarding the court's rulings. She contends (1) there was no authority for the court to order any examinations by prosecution experts; (2) in any event, it was improper to order examinations by more than one such expert; (3) it was improper to permit an examination by Dr. Mills in particular; and (4) Dr. Mills's testimony amounted to improper profile evidence.

Defendant argues that the *Danis* holding, recognizing the trial courts' inherent power to authorize prosecution experts to examine defendants who place their mental state at issue, did not survive the enactment of the criminal discovery statutes in 1990.[14] (*Danis*, *supra*, 31 Cal.App.3d at p. 786; see § 1054, subd. (e) ["no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States"].) After defendant's opening brief was filed, this court vindicated her argument in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106 (*Verdin*). The Attorney General concedes that the trial court's order was based on *Danis*, and therefore could not stand under *Verdin*. However, the Attorney

---

[14] Defendant claims the order for examination by prosecution experts violated her privilege against self-incrimination under the Fifth and Fourteenth Amendments, as well as her Sixth and Fourteenth Amendment rights to due process and the effective assistance of counsel in that counsel was not allowed to be present during the examinations.

General contends we should not apply *Verdin* retroactively, and alternatively claims the error did not prejudice defendant.

The Attorney General's retroactivity argument is without merit. Our opinion in *Verdin* did not declare a new rule, but simply established the meaning of the discovery statutes as they then stood.[15] Because *Verdin* "only elucidate[d] and enforce[d] prior law, no question of retroactivity arises." (*Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 36; see *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1023; *People v. Mutch* (1971) 4 Cal.3d 389, 394-395. See also *People v. Wallace*, *supra*, 44 Cal.4th at p. 1087 [applying *Verdin*].)

Although we held in *Verdin* that the criminal discovery statutes had deprived trial courts of their inherent authority to require a criminal defendant to submit to a mental examination, we also made it clear that there was a separate statutory basis for appointing mental health experts. (*Verdin*, *supra*, 43 Cal.4th at p. 1109.) Under Evidence Code section 730, "[w]hen it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required." In *Verdin*, the Court of Appeal had denied the defendant's pretrial petition for writ relief. We reversed, noting that the People had not requested the appointment of an expert under Evidence Code section 730, nor had the trial court made such an appointment. Thus, the People had forfeited reliance on that

_____

[15] The Legislature promptly responded to *Verdin* by enacting section 1054.3, subdivision (b), which authorizes courts to order examination by a mental health expert retained by the prosecution whenever a defendant places his or her mental state at issue through expert testimony. (Stats. 2009, ch. 297, § 1.) Whether the new statute would be applicable on a retrial is a question we need not consider. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288, 299-300; *People v. Ledesma* (2006) 39 Cal.4th 641, 663-664; *People v. Mattson* (1990) 50 Cal.3d 826, 849.)

source of authority. (*Verdin*, at pp. 1109-1110.) Nevertheless, we noted that the People were free to seek an appointment under Evidence Code section 730 upon remand. (*Verdin*, at p. 1117.)

Here, defendant did not argue in the trial court that the prosecutor's request was precluded by the discovery statutes.[16] Had she done so, the court could and likely would have resorted to its power to appoint experts under Evidence Code section 730, which was invoked in the prosecutor's motion.[17] During arguments on the motion, the court twice mentioned its authority under Evidence Code section 730, although the Attorney General properly concedes that the court ultimately relied on its inherent authority under *Danis*. However, defendant's failure to object on the statutory grounds discussed in *Verdin* bars her from raising the error on appeal. A different rule would be unfair to the prosecution and the trial court, which could have avoided the error had it been brought to their attention. (*People v. Saunders* (1993) 5 Cal.4th 580, 590; see also, e.g., *In re Seaton* (2004) 34 Cal.4th 193, 198.) In any event, even if defendant had not forfeited the claim, the *Verdin* error would be harmless. The court expressly recognized that the interests of "fairness" and "the ascertainment of truth" required the prosecutor to be able to meet the evidence of the defense experts. Its mistaken reliance on *Danis* was not prejudicial, given the alternate source of authority provided by Evidence Code section 730.

---

[16] Defendant asserts she made such a claim, but the record shows otherwise. Defendant refers to a page of her opposition where she relied on her Fifth Amendment privilege and claimed that "statements by a defendant are specifically omitted from the discovery provisions of the Penal Code (section 1054.3)." This claim did not alert the court to the idea that the prosecutor's request for examination was barred by the discovery statutes; rather, it argued that defendant's statements were exempt from discovery. That argument was incorrect, of course; statements made by defendant to her own experts and reflected in their reports were discoverable and were provided to the prosecution without objection below.

[17] Defendant suggests the court was unlikely to appoint experts, because their fees would have been payable from the court's own budget. However, Evidence Code section 731, subdivision (a) specifies that fees fixed under Evidence Code section 730 are payable from the county treasury.

Defendant also argues, as she did below, that she did not raise her mental condition as a defense, and therefore did not waive her constitutional rights against self-incrimination and due process. This position is untenable. The centerpiece of the defense was defendant's assertion that her actions were explained by battered woman syndrome. Defendant squarely placed her mental state at issue, claiming she was a victim unable to overcome her fear of Ivan and protect the child she had taken into her care. The evidence she presented in support of that claim was subject to rebuttal. As the Attorney General points out, had the defense been content with evidence of battered woman syndrome in general, without presenting experts who had examined defendant, the prosecution would have had no ground for requesting an examination by its experts. But since the defense did present expert testimony based on interviews with defendant, the court properly found that fairness required giving the prosecution the opportunity to counter that testimony. It is settled that a defendant who makes an affirmative showing of his or her mental condition by way of expert testimony waives his or her Fifth and Sixth Amendment rights to object to examination by a prosecution expert. (*People v. Carpenter* (1997) 15 Cal.4th 312, 412-413; *People v. McPeters* (1992) 2 Cal.4th 1148, 1190; *Danis*, *supra*, 31 Cal.App.3d at p. 786.) [18]

Defendant further claims that a rule exposing her to examination by prosecution experts on battered woman syndrome would open the door to compulsory examination of witnesses who are claimed to suffer from this syndrome, or from rape trauma syndrome. However, nothing in the *Danis* rule, now codified in section 1054.3, subdivision (b), implicates the situation of witnesses, who are not parties and do not choose to place their mental condition at issue as defendants may.

Defendant contends the court erred by ordering her to submit to more than one interview, by instructing the jury that it could consider her refusal to be interviewed by

---

[18] The same reasoning applies to defendant's claim that her Fourteenth Amendment right to due process was violated.

Dr. Mills, and by preventing her from explaining the reasons for her refusal when she was on the witness stand.[19]  Defendant's briefs are devoid of legal authority in support of these arguments.  We cannot say the court abused its discretion by deciding that two prosecution experts would be permitted to rebut the testimony of two defense experts.  The jury instruction on defendant's refusal to be examined was similar to the instruction approved in *People v. Carpenter*, *supra*, 15 Cal.4th at pp. 412-413.  While the instruction was infected by the *Verdin* error in ordering the examinations (*People v. Wallace*, *supra*, 44 Cal.4th at p. 1087), defendant forfeited that claim and was not prejudiced in any event, as discussed above.  Moreover, the court permitted her to explain that her refusal to be examined by Dr. Mills was based on the advice of counsel.  Defendant claims she should have been able to tell the jury that her counsel believed Dr. Mills was not an expert in battered woman syndrome, and that Dr. Mills had an unfair advantage because he, unlike the defense experts, had interviewed Ivan.  However, Dr. Mills did not testify about battered woman syndrome, and defense counsel established his lack of expertise in that area on cross-examination.  It is unclear how defendant would have benefited had the jury learned of Dr. Mills's access to Ivan.  In any event, hearsay conversations between defendant and her counsel regarding their legal strategy were clearly inadmissible.

Defendant argues that it was an abuse of discretion to permit Dr. Mills to evaluate defendant over the defense's objections that he was biased by his prior evaluation of Ivan and lacked expertise in battered woman syndrome.[20]  Again, defendant provides no legal authority for her claim, and we find no merit in it.  It is a matter of speculation what effect the doctor's interview with Ivan may have had, and the jury did not learn that he had evaluated Ivan.  Nor did the prosecutor seek to use Dr. Mills as an expert on battered

---

[19]    Defendant asserts violation of her federal Fifth, Sixth, and Fourteenth Amendment rights to a fundamentally fair trial, and her Fifth Amendment privilege against self-incrimination.

[20]    She claims violation of her federal Fifth, Sixth, and Fourteenth Amendment due process rights, and her Eighth Amendment right to a reliable verdict.

woman syndrome. Instead, he offered the doctor's testimony for purposes of general psychiatric evaluation and the exploration of alternate explanations for defendant's mental state. Defendant fails to establish an abuse of discretion in the order allowing Dr. Mills to serve as one of the prosecution experts.

Finally, defendant claims the court erred by allowing Dr. Mills to testify that defendant had an incentive to malinger because she faced the death penalty, and that her inconsistent statements on various subjects reflected malingering. She analogizes the doctor's testimony to improper profile evidence.[21]

Before Dr. Mills took the stand, defense counsel objected to any testimony that would invade the province of the jury by opining on defendant's credibility. The court agreed that it would be improper for the doctor to tell the jury what to think about defendant's credibility, but ruled that it would be proper for him to express a view on whether it was reasonable for another expert to form a professional opinion based on defendant's statements. The court noted that the issue "somewhat straddl[es] the line between what a jury should believe and what a mental health expert should believe in forming an opinion." It advised the prosecutor to "draw your questions carefully and talk to the doctor carefully about not telling the jury what they should believe." Regarding the significance of the fact that defendant was facing the death penalty, the court stated, "we don't need an expert to opine that somebody facing the death penalty has a motive to generally lie." The prosecutor said he had no intention of asking Dr. Mills about that, because he did not want to bring the subject of penalty into the guilt phase.

However, when Dr. Mills took the stand the prosecutor made it clear that he intended to elicit an opinion that "the incentive for malingering in a case like this is high." Defense counsel's objection was overruled. Dr. Mills testified that the death penalty created a "very high" incentive for "embellishing or distorting." In the remainder

---

[21]  Again, defendant refers to her federal Fifth, Sixth, and Fourteenth Amendment due process rights, and her Eighth Amendment right to a reliable verdict.

of his direct testimony, which was not prolonged, Dr. Mills described the nature of posttraumatic stress disorder, the problems experts have with unreliable data from those whose stakes in litigation give them reason to lie, and some of the inconsistencies in defendant's statements that led him to believe a reliable diagnosis of posttraumatic stress disorder was impossible.

During a break, defense counsel expressed concern over the doctor's views on the death penalty as a motive for lying, given the court's earlier ruling. Counsel did not, however, ask for an admonition to the jury. The court did not share counsel's concern, noting that the jury was well aware of the stakes in the case and taking the view that the prosecutor's questions properly had to do with "evaluating credibility and taking a history." Counsel responded that if Dr. Mills's view on this point was not adding anything to what the jury already knew, it was more prejudicial than probative for the expert to "keep highlighting it." The court overruled the objection.

The proper scope of expert testimony is limited to subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); see *People v. Lindberg* (2008) 45 Cal.4th 1, 45.) Here, the court properly determined in advance of Dr. Mills's testimony that the doctor's view on the death penalty as an incentive to malinger was not necessary to assist the jury, and the prosecutor agreed not to explore the subject. However, the prosecutor proceeded to ask the doctor generally about defendant's incentive for malingering, and Dr. Mills immediately brought up the death penalty in his response. The court should have sustained defense counsel's objections, and an admonishment would have been proper.

The possibility of prejudice, however, was minimal. As the court observed, it was "not news to the jury" that it was a capital case, and the incentive described by Dr. Mills was an obvious one. Defense counsel effectively cross-examined Dr. Mills on this point, getting him to concede that the stakes were high for all concerned in the case, and that a defendant is not to be disbelieved simply because he or she is facing the death penalty.

43

Moreover, far more direct and damaging evidence of defendant's malingering was supplied by her own expert, Ryan, who told the jury that defendant's responses to the personality tests he gave her reflected a high degree of falsity, to such an extent that the results of one test were invalid.

Defendant contends the court also erred by permitting the doctor to give his view on whether defendant's malingering, as reflected in the conflicts in her statements about various events, undermined the opinions given by her expert witnesses. We disagree. The defense relied heavily on expert testimony to explain the inconsistencies in defendant's statements. It was proper to allow the prosecution to rebut that testimony with Dr. Mills's opinion that the foundation for the defense experts' conclusions was unreliable.

### d. *Exclusion of Statements by Ivan*

Defendant filed a pretrial motion seeking the admission of certain statements made by Ivan when he was questioned by detectives after Genny's death. Defendant summarized the statements as follows: "[T]he defendant and the codefendant left the bathroom together after placing the decedent in the tub. The codefendant admits that only he came back into the bathroom after both had previously left. He admits that the decedent was still alive when he went back to the bathroom. The codefendant indicated that he did not think the water was hot. He said the decedent was making a noise but he thought it was because she didn't want to take a bath. He admits he set the water and if she had told him it was hot he would have taken her out and put cool water in. The codefendant admits that the child may have been too scared of him to say anything. He admits yelling at her to take a bath and not to come out."

Defendant contended these statements amounted to declarations against interest under the hearsay exception codified in Evidence Code section 1230. When the motion was heard, counsel argued that because Ivan knew he was under suspicion when he was interrogated, his statements tended to incriminate him and therefore were reliable enough

44

to be admitted. Counsel was unwilling, however, to concede that exculpatory statements by Ivan should be admitted, characterizing them as "self-serving." The court denied the motion, ruling that all of Ivan's statements were essentially exculpatory, not self-incriminating. The court reasoned that while certain statements taken out of context might be useful to defendant for casting blame on Ivan, those statements could not be characterized as admissions that no reasonable person would make unless they were true.

After Ivan's trial concluded, defendant sought reconsideration. In this motion, she argued that the prosecutor had used Ivan's statements to prove his guilt, telling Ivan's jury that the statements contained "kernels of truth." If the statements were reliable enough to be used against Ivan, defendant asserted they should also be admitted at her trial. In arguing this motion, counsel told the court he now recognized that if defendant were allowed to introduce certain of Ivan's statements, the prosecutor could "put on the whole tape if he wants to." The court adhered to its previous ruling, finding that Ivan's statements were not declarations against interest but instead efforts to deny responsibility for Genny's death.

Defendant again pressed the court to allow Ivan's statements into evidence after the prosecutor raised the issue of Ivan's attempt to use a battered spouse defense. (See pt. II.A.1.a., *ante*.) Counsel argued that Ivan's statements would "set the record straight as to what Ivan actually did say as far as his involvement is concerned." Counsel renewed this claim after the court permitted the prosecutor to inform the jury that an expert had deemed Ivan a battered spouse. The court ruled that the prosecutor's comments did not open the door to the admission of Ivan's statements to the police.

In this court, defendant claims the court erred by ruling that Ivan's statements placing him in the bathroom with Genny at crucial times were inadmissible under the hearsay exception for declarations against interest. We disagree. Evidence Code section 1230 permits a hearsay statement to be admitted if it "so far subjected [the declarant] to the risk of civil or criminal liability . . . that a reasonable man in his position would not

45

have made the statement unless he believed it to be true." " 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584 (*Geier*).)[22]

Here, the court accurately noted that Ivan's statements were attempts to excuse himself from liability. Some were plainly unbelievable, such as his claim that he would have done something if Genny had told him the water was hot. The court observed that a child being severely scalded would make it obvious to anyone that "she was in mortal danger." Defendant claims that Ivan incriminated himself merely by admitting he was in the bathroom around the time Genny was burned. However, " '[e]ven when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. . . .' [Citation.]" (*Geier*, *supra*, 41 Cal.4th at p. 584.) This is such a case.

Defendant argues that even if Ivan's statements were false, they reflected consciousness of guilt. However, basic trustworthiness and factual truthfulness are required for a statement to qualify for admission under Evidence Code section 1230. (*Geier*, *supra*, at p. 584.) Defendant essentially concedes that Ivan's statements did not disclose the true circumstances of Genny's death. She goes so far as to contend that Ivan's statements were lies comparable to her own lies to the police, and thus were

---

[22] We note that Ivan's statements were admissible at *his* trial as statements of a party under Evidence Code section 1220. A different analysis is required when a nonparty's statements are offered as declarations against interest under Evidence Code section 1230.

46

admissible for the nonhearsay purpose of showing that "dependent spouses would lie to protect the other." This unusual theory was not raised below. We do not address it here, except to note that it does not tend to support the conclusion that defendant was innocent.

In any event, Ivan's consciousness of guilt was not at issue; both sides at defendant's trial took the position that he was knowingly guilty of Genny's murder. The court, with the agreement of counsel, informed the jury that Ivan had been convicted and sentenced to death. It advised the jury that this information was only relevant to its evaluation of the testimony of witnesses who were friends or family members of both defendant and Ivan, and reminded the jury that only defendant's guilt was at issue in the present trial. Thus, statements by Ivan reflecting his guilt were not relevant on any contested issue.

Defendant also claims the trial court should have allowed her to bring in Ivan's statements to rebut the prosecutor's insinuations that Ivan had employed a battered spouse defense. The argument lacks logic. Ivan's statements to the police were not inconsistent with a battered spouse claim, nor did they tend to reflect the nature of the defense his attorneys presented.

### 2. *The Evidence of Defendant's History of Abuse as a Child*

Before trial, the prosecutor objected to the admission of evidence of the abuse defendant suffered as a child, noting that he would have to respond to it and time would be spent on collateral issues. The defense insisted the evidence was relevant because its expert psychologist, Ryan, believed defendant's experiences as a child had contributed to her battered woman syndrome, and were mirrored in the dynamics of her marriage. The court agreed that the defense was entitled to bring in this evidence.

Defendant testified at length about her childhood abuse at the hands of her mother and stepfather. Ryan testified that the emotional and physical abuse defendant's mother inflicted on her, and the sexual abuse by her stepfather, which her mother refused to believe, contributed to her low self-esteem and to the development of a marital

47

relationship in which she became a battered woman. On cross-examination, Ryan agreed that batterers tend to come from violent homes, and that children tend to identify with and model their behavior after the parent of the same gender as the child. A girl, for instance, might "learn domestic violence from her mother." On redirect, Ryan said that about 75 percent of battered women come from a home where they observed domestic violence, and that defendant's experience of abuse as a child made it more likely that she would become a battered woman. She would submit to a battering relationship more readily than someone who had not had such experiences.

Cynthia Bernee, the other defense expert on battered woman syndrome, also testified that childhood abuse is a significant factor in the syndrome. In defendant's case, her experiences had taught her that she lacked control over her environment and predisposed her to become a victim of domestic violence by Ivan.

After the defense rested, the court and counsel engaged in an extended discussion on the scope of the prosecutor's rebuttal regarding the child abuse evidence. The prosecutor said his expert psychologist, Kaser-Boyd, would testify that victims of childhood abuse develop poor rage control mechanisms and tend to model the abusive behavior of their parents. He conceded that the evidence was similar to profile evidence, and could not have been presented as part of his case-in-chief, but claimed the defense had opened the subject by presenting evidence that defendant's childhood abuse set her up to become a victim of domestic abuse as an adult. The court expressed concern about testimony directly tying defendant's experiences as a child to her propensity for committing child abuse herself. It noted that the defense evidence of abuse and battered woman syndrome was limited to explaining defendant's failure to protect Genny.

The defense responded that while it would not object to a prosecution expert testifying that defendant's experiences made her more likely to be a battering spouse, it did oppose testimony that she was more likely to be a child abuser. There was a good deal of discussion about whether, if the prosecutor introduced evidence that Ivan's

48

childhood home was not a violent one, the defense would be able to introduce Ivan's report to Dr. Weinstein that his brother and an uncle had molested him. The prosecutor ultimately decided that his rebuttal as to defendant's child abuse would be limited to two points: (1) that children model their parents' behavior and may learn from abuse to react with rage as adults; and (2) that child abuse can set a person up to be an abuser as easily as a victim.

The court suggested that, as so limited, the proffered testimony was proper rebuttal. The defense objected that it had not tried to show that defendant's experience made her less likely to be a child abuser, and that the inference the prosecutor sought to draw went directly to an ultimate issue in the trial, unlike the defense's battered woman syndrome evidence. The court was not persuaded.

The prosecutor questioned Kaser-Boyd about the concept of role modeling. She responded that children learn by imitation and parents are strong role models, so that children may imitate the behavior they see at home and subsequently reenact it. The prosecutor asked if poor emotional control was related to role modeling. Kaser-Boyd said: "If one has had a role model with poor emotional control who acted out frustration in emotionally uncontrolled ways, let's say a parent who goes into a rage or a parent who is abusive in their actions, hits too hard, does things that make a child suffer, the child goes through terror, really, when they experience that. And the act of, or the experience of terror, we believe, causes changes in personality, and it also causes changes in the developing brain. [¶] Little people who feel terrified have more cortisol in their brains. They have often the frequent tapping of adrenalin and, over the long term, that damages parts of the brain that are required for good emotional control."

Kaser-Boyd explained that children do not necessarily reenact exactly the abuse they suffered. Asked whether the research showed that battered women could abuse children themselves, she responded that a leading study showed 28 percent of battered women admitted being abusive to their children. In her own practice, she did not have a

49

statistic but had found that "it's definitely the case that some battered women are also physically abusive to their children." The prosecutor proceeded to question Kaser-Boyd about her examination of defendant, but elicited no opinion as to whether defendant's experience of child abuse predisposed her to be a child abuser herself.

Kaser-Boyd's testimony lasted for an entire day. The following day, the jury was excused and the court and counsel discussed instructions. On the next court day, before proceeding with the defendant's surrebuttal witnesses, the court gave the following instruction to the jury, which was repeated at the end of the guilt phase:

"It's important for you to understand the purpose for which certain evidence has been offered. The defense has offered defendant's testimony that she did not commit the crimes for which she's charged. They've also offered extensive evidence regarding the battered woman's syndrome. The battered woman's syndrome evidence is not offered to show that someone suffering from the battered woman's syndrome could not or would not commit the crimes charged; rather, it is offered to prove a potentially innocent explanation for defendant's failure to protect Genny and failure to provide medical care for her as well as to provide a context for defendant's statements following Genny's death.

"Likewise, the people have offered evidence that a person's childhood physical abuse could result in that person growing up to be either a victim or an abuser. This is not offered to show that someone abused as a child is more likely to be an abuser as an adult; rather, it is offered to show that being a victim of physical abuse as a child is not inconsistent with commission of violent crimes as an adult.

"You must not consider this evidence for any purpose other than the purposes for which it was offered."

Defendant argues that Kaser-Boyd's testimony amounted to improper "battering parent syndrome" evidence, of the kind disapproved in *People v. Walkey* (1986) 177

50

Cal.App.3d 268 (*Walkey*).[23] In *Walkey*, a physician testified that the murder victim, a child, had been abused. The doctor described the profile of a child abuser, telling the jury that the most important single factor was being abused oneself as a child. After the defendant testified in his own behalf, the trial court allowed the prosecutor to cross-examine him about abuse he had suffered as a child. In closing, the prosecutor argued that the defendant fit the profile of a battering parent. (*Id*. at p. 277.) The Court of Appeal held it was error to permit what amounted to character evidence showing that the defendant was a typical battering parent. It noted, however, that if a defendant introduces evidence of his good character, cross-examination to counter that evidence would be proper. (*Id*. at pp. 278-279.)

Here it was defendant who, over the prosecutor's objection, introduced the subject of her abuse as a child and the effect it had on her as an adult. The trial court properly allowed the prosecutor to respond to that evidence. This is not a case like *Walkey*, where the prosecution improperly sought to prove guilt on the basis of general characteristics. (See also *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1086 ["Profile evidence is unfairly relied upon to affirmatively prove a defendant's guilt based on his match with the profile"].)

Defendant argues, as she did below, that her evidence was strictly limited to the impact of child abuse on the likelihood of becoming an abused spouse, so that proper rebuttal should have also been so limited. We disagree. "The scope of rebuttal evidence is within the trial court's discretion, and on appeal its ruling will not be disturbed absent ' " palpable abuse." ' [Citation.]" (*People v. Wallace*, *supra*, 44 Cal.4th at p. 1088.) Defendant introduced evidence of her childhood abuse in an attempt to bolster her claim that she was an abused spouse. The purpose of this evidence was to explain her failure to protect Genny and her contradictory statements to the police, including admissions that

_____

23      Defendant claims her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to a fair trial and a reliable verdict were violated.

51

she participated in some of the abuse Genny suffered. The defense experts testified that a battered woman may take responsibility for acts of abuse perpetrated by the battering spouse. Certainly it was proper for the prosecutor to counter this testimony with expert opinion that an abused child may also grow up to be an abuser. The trial court instructed the jury on the limited purpose for which this testimony could be considered. No error appears.

Defendant argues that the court should have permitted her to respond to the prosecutor's rebuttal by questioning Ivan's brother about his sodomization of Ivan as a child. However, not only did the brother not testify, but also the prosecutor made no attempt to show that Ivan had a good childhood. Defendant further claims she should have been able to call Dr. Weinstein and question him about Ivan's report that he had been sodomized. Defendant did not seek that opportunity below; the defense had rested by the time this point was discussed, and defense counsel never asked to call Dr. Weinstein for any purpose other than rebutting the notion that Ivan was not abused as a child. Defendant's argument on this point lacks any merit. It was her choice to bring her own childhood abuse before the jury. The court properly allowed the prosecutor to respond to defendant's evidence, but nothing in that response justified allowing defendant to explore Ivan's childhood experiences as well.

### 3. *Instructional Issues*

Defendant complains that the jury instructions on the mental states required for murder and the special circumstances were incomprehensible.[24] However, she fails to develop a legally coherent argument. She merely recites instructions, parses certain

---

[24] The prosecutor advanced two theories of first degree murder: murder perpetrated by torture, and felony murder committed in the course of mayhem. (§ 189.) Two special circumstances were alleged: torture felony murder (§ 190.2, subd. (a)(18)) and mayhem felony murder (§ 190.2, subd. (a)(17)(J)).

terms, and questions whether the jury could have understood them.[25] The Attorney General correctly notes that many of the instructions with which defendant now quibbles were not objected to below, or were requested by defense counsel. The doctrine of invited error bars defendant from challenging instructions she requested as a tactical choice. (*People v. Harris* (2008) 43 Cal.4th 1269, 1293.) While defendant may raise a claim that her substantial rights were affected by instructions to which she did not object (§ 1229; *People v. Benavides* (2005) 35 Cal.4th 69, 111), she falls well short of making such a showing.

Defendant claims the instructions left the jury with the impression that mayhem felony murder must be first degree murder. That impression was accurate; mayhem felony murder is by statute murder in the first degree. (§ 189.) Defendant objects that the instructions on the elements of mayhem and the mayhem-murder special circumstance required no more than the intent to vex, annoy, or injure. That is incorrect; the instructions properly informed the jury that mayhem felony murder requires the specific intent to commit mayhem. (*People v. Sears* (1965) 62 Cal.2d 737, 744-745.) The fact that the instruction on the elements of mayhem mentioned only the intent to vex or annoy did not render the instructions confusing or circular, as defendant claims. (See *People v. Hayes* (2004) 120 Cal.App.4th 796, 804-805.)

Defendant asserts the instructions did not adequately distinguish between first degree murder by torture and second degree torture felony murder. However, the distinction was accurately noted by defense counsel when he pressed for the second degree torture felony murder instruction: the second degree offense does not require premeditation. This difference was plain on the face of the instructions, and defense

---

[25] She claims her rights to due process and a jury trial under the Fifth and Sixth Amendments were violated, as well as her right to a reliable factfinding process under the Eighth and Fourteenth Amendments.

counsel explained it to the jury as "real simple" in his closing argument. There was no error here.

Defendant next claims that CALJIC No. 8.34, explaining aiding and abetting liability for second degree torture felony murder, failed to distinguish between first and second degree murder by an aider and abettor. That distinction was beyond the scope of the instruction. CALJIC No. 8.27 explained aiding and abetting liability for first degree mayhem felony murder. Together, these two instructions covered the liability of an aider and abettor for felony murder in this case. Defendant complains that no instruction directly explained aiding and abetting liability for first degree murder by torture. However, the jury was instructed generally and properly on the liability of aiders and abettors, and those instructions were sufficient to guide the jury in determining whether defendant aided and abetted a first degree murder by torture. Defendant did not request a more specific instruction. (See *People v. Bennett* (2009) 45 Cal.4th 577, 598.)

Defendant notes that the definition of torture was presented to the jury as it related to torture as a lesser related offense. She contends the jury would not have understood that the definition also applied to the earlier instructions on first degree murder by torture and second degree torture felony murder. We are satisfied, however, that there is no reasonable likelihood the jury would have failed to make those connections. (See *People v. Wilson* (2008) 44 Cal.4th 758, 803.) Defendant also claims the first degree murder by torture instruction, requiring the jury to find a "willful, deliberate and premeditated intent to inflict extreme and prolonged pain," was confusing when compared with the instruction on the crime of torture, requiring merely the "intent to cause cruel or extreme pain and suffering." It was not. Defendant acknowledges that the distinctions between these intent requirements are explained in *People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1204-1206, but she contends they were too subtle for the jury. We are not so skeptical of the jurors' abilities. It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. (*People v. Lewis* (2001)

54

26 Cal.4th 334, 390.) The record reflects no confusion on the part of the jury, or requests for further guidance on these points.

Defendant's final argument concerns a modified version of CALJIC No. 8.81.17, regarding the mayhem-murder special circumstance. At defense counsel's request, the court added the element of specific intent to commit mayhem. Over the prosecutor's objections and with defense counsel's agreement, the court also imported a version of the third paragraph of CALJIC No. 8.80, explaining the intent requirements should the jury find that defendant was an actual killer, on the one hand, or an aider and abettor, on the other. Defendant contends the instruction was "hopelessly complicated." We disagree; the instruction was approved by defense counsel and comprehensible by the jury.[26]

### 4. *Sufficiency of the Evidence of Torture and Mayhem*

Defendant contends the evidence was insufficient to establish the criminal intent required for mayhem felony murder, murder by torture, and the mayhem and torture felony-murder special circumstances.[27] The argument is meritless. As to the mayhem felony-murder special circumstance, the jury found that defendant specifically intended

---

[26] Defendant particularly objects to the following paragraph, which the court derived from CALJIC 8.80: "If you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true. However, if you find that the defendant was not the actual killer of a human being, or if you're unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the mayhem special circumstance to be true as to the defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any act of the commission of murder in the first degree, or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of mayhem which resulted in the death of a human being."

Defendant does not argue that the instruction was legally incorrect, but merely claims it was confusing. We find no error.

[27] She claims violation of her due process rights under the Fifth and Fourteenth Amendments, and her right to a reliable verdict under the Eighth Amendment.

to commit mayhem, in the course of which Genny was murdered, and that defendant was either the actual killer or an aider and abettor who acted with the intent to kill or with reckless indifference to human life.  As to the torture felony-murder special circumstance, the jury found that the murder was intentional and that defendant meant to inflict extreme and cruel physical pain for a sadistic purpose.  The evidence supporting these findings was more than adequate.

"The standard of appellate review for determining the sufficiency of the evidence is settled.  ' "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.)" ' (*People v. Abilez* [(2007)] 41 Cal.4th [472,] 504.)  '. . . We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.)  Thus, we presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1058.)" (*People v. Wilson*, *supra*, 44 Cal.4th at p. 806.)

Defendant contends there was no evidence she harbored a specific intent to maim Genny.  She relies on cases holding that evidence showing no more than an indiscriminate attack on the victim does not support a mayhem felony-murder conviction. (*People v. Sears*, *supra*, 62 Cal.2d 737, 745; *People v. Anderson* (1965) 63 Cal.2d 351, 359.)  This is not such a case.  Genny suffered discrete injuries over an extended period of time, including a serious burn wound on her head, multiple bruises, scars, abrasions, and lacerations all over her body, subdural and subarachnoid hematomas, and the severe scalding that ultimately caused her death.  The scalding required the bathtub to be filled in advance with hot water, and Genny was deliberately held down in the water for long

56

enough to cause her skin and toenails to slough off. The jury had more than enough evidence of specific intent to maim. Direct evidence that defendant actually inflicted the fatal scalding was lacking, but powerful direct and circumstantial evidence supported the conclusion that she at least aided and abetted Ivan in inflicting the terminal injury. [28] Defendant admitted that she removed Genny from the bathtub, severely burned, and did not seek medical help. She also admitted that she used the blow dryer to blow air on Genny, and the jury could have inferred that defendant inflicted the scars on Genny's cheeks and elsewhere that matched the blow dryer's grill.

A similar analysis applies to defendant's claim that the evidence failed to establish her deliberate intent to inflict the extreme and prolonged pain required for murder by torture. (See *People v. Steger* (1976) 16 Cal.3d 539, 546; *Walkey*, *supra*, 177 Cal.App.3d at pp. 275-276.) The long course of painful abuse suffered by Genny suggested that defendant and Ivan *habitually* tortured her. Defendant's answers in the July 24 interview with detectives confirmed that she and Ivan acted together. On the day of Genny's death, one or both of them deliberately filled the tub with hot water and forced Genny into it. Both witnessed the extreme and prolonged pain that ensued as Genny lay dying, and did nothing to secure assistance until her body began to stiffen. Regarding the torture felony-murder special circumstance, defendant claims the evidence failed to establish her intent to kill. We disagree. Defendant admitted she thought Genny was dying when she pulled her from the bathtub, unconscious. By failing to get help, she ensured Genny's death. The evidence of intent to kill was sufficient.

---

[28] In her reply brief, defendant relies on *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164-1165, for the proposition that when the aider and abettor may have had a less culpable mental state than the perpetrator, it is error to instruct the jury that an aider and abettor is "equally guilty." Defendant's jury was similarly instructed. However, as defendant concedes, the *Samaniego* court deemed the instructional error harmless where a special circumstance alleging intent to kill was found true. (*Id*. at pp. 1165-1166.) Here, the jury returned such a true finding. Accordingly, *Samaniego* does not aid defendant.

### 5. *Merger of Mayhem and Homicide*

Defendant contends a conviction of mayhem felony murder in this case would violate the "merger doctrine" articulated in *People v. Ireland* (1969) 70 Cal.2d 522, a second degree murder case, and extended to first degree felony murder in *People v. Wilson* (1969) 1 Cal.3d 431, 441-442 (*Wilson*).[29]  In her reply brief, defendant notes that this court recently overruled *Wilson* and held, prospectively, that the merger doctrine has no application to first degree felony murder.  (*People v. Farley* (2009) 46 Cal.4th 1053, 1121-1122.)  Although *Farley* does not apply here, the Attorney General correctly notes that our preexisting jurisprudence had limited *Wilson* to cases of burglary felony murder where the defendant's only felonious purpose was to assault or kill the victim.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1262; *People v. Burton* (1971) 6 Cal.3d 375, 387-388.)

Defendant relies on *People v. Smith* (1984) 35 Cal.3d 798, 806, a second degree murder case holding that felony child abuse, when it consists of a direct assault on a child resulting in death, comes within the merger doctrine.  *Smith* has no application here.  We have long restricted the merger doctrine in first degree murder cases to felony murder based on burglary, "due to the unusual nature of burglary."  (*People v. Burton*, *supra*, 6 Cal.3d at p. 388.)  In any event, the crime of mayhem felony murder has an "*independent felonious purpose*" that distinguishes it from the felony child abuse discussed in *Smith*.  (*Burton*, at p. 387.)  The defendant must intend to permanently disfigure the victim, which goes well beyond the merely assaultive purpose the *Smith* court considered incompatible with the felony-murder rule.  (*Smith*, at pp. 805-806; *People v. Sears*, *supra*, 62 Cal.2d at pp. 744-745.)

The primary policy reason for the felony-murder doctrine was fully operative in the circumstances of this case.  "The purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for

---

[29]    Defendant claims that allowing the jury to consider the felony-murder theory violated her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.) Although defendant contends "the felony-murder rule cannot be much of a deterrent to a person who has decided to assault a child with intent to maim," the medical testimony here was that Genny could have survived had she been given prompt medical care, though the scalding would have scarred her for life. This mayhem need not have resulted in a murder. Thus, the merger doctrine has no logical application in this case.

### 6. *Cumulative Guilt Phase Error*

Defendant argues that this was a close case, and that the errors during the guilt phase, even if not prejudicial in themselves, justify reversal when considered together. Neither proposition is supportable. The case presented at the guilt phase was quite strong, supported by graphic and telling physical evidence, both in the condition of Genny's body and the conditions found in defendant's apartment. Defendant's own statements were powerfully incriminating. The attempt by the defense to explain away those statements and minimize defendant's culpability, by presenting her as a battered woman controlled by her husband, was weak. (See pt. II.A.1.b., *ante*.)

Any errors during the guilt phase were relatively insignificant. Assuming it was improper to allow the prosecutor to inform the jury that Ivan had been deemed a battered spouse by one expert, the effect on the determination of defendant's guilt was negligible. As we have noted, battered woman syndrome was not a defense to the charged crimes, and other evidence cast serious doubt on defendant's status as a battered woman. (Pt. II.A.1.b., *ante*.) The *Verdin* error discussed in part II.A.1.c., *ante*, was merely a technical one, given the alternate source of authority in Evidence Code section 730 for ordering defendant to submit to examination by mental health experts. The error in permitting Dr. Mills to opine that the death penalty was an incentive to malinger had minimal impact, as

also discussed in part II.A.1.c., *ante*. We are satisfied beyond a reasonable doubt that these irregularities, considered together, did not affect the outcome of the guilt phase.

B. *Penalty Phase*

1. *Rebuttal Evidence and Cross-Examination of Mary Rojas*

The defense called Mary Rojas, defendant's sister and Genny's mother, as a penalty phase witness. Rojas testified about the abuse she and defendant suffered as children. She testified that she had seven children, including "Genny, the one that died," and another daughter whom she had also named Genny. Rojas said her children were taken away from her twice, once because her husband Pete had molested the oldest daughter, and again because of Rojas's drug problems. Rojas was in a rehabilitation program when she learned that Genny had died. She was currently living with five of her children, and did not allow Pete to live with her.

Defense counsel asked Rojas about Genny's funeral and burial. Rojas said her mother did not help with the expenses. Rojas, her church, and Pete had contributed money to cover the costs. Genny was buried in a family plot with Rojas's aunt. Rojas was still making monthly payments, and hoped to get a headstone when the plot was paid for. Rojas loved and missed Genny and her death had been very hard on the family. However, defendant's life also meant a lot to Rojas. If defendant were given the death penalty "it's going to hurt my kids again."

Defendant takes issue with the prosecutor's cross-examination of Rojas. She objects to questions regarding Rojas's drug abuse and neglect of her children, exploring where the money for Genny's burial came from, asking why Rojas had chosen to have another child and name her Genny even before "the old Genny" had a headstone, and establishing that Pete was the father of the newest baby and had been at the house when Rojas was interviewed by an investigator for the prosecution. Defendant also contends the court erred by allowing the prosecutor to introduce photographs of Genny's burial plot. She claims the prosecutor improperly attacked Rojas's character, which was not at

issue, and vilified defendant's entire family in an attempt to make the jury feel comfortable voting for the death penalty. [30]

Defendant's indignation is unwarranted. As the Attorney General points out, defendant did not object at trial to many of the questions about which she now complains. To that extent, she has forfeited her claims of error. (*People v. Gray* (2005) 37 Cal.4th 168, 215.) Furthermore, there was no error. "Cross-examination . . . 'may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given . . . on direct examination.' [Citation.]" (*People v. McClellan* (1969) 71 Cal.2d 793, 811; accord, *People v. Farley*, *supra*, 46 Cal.4th at p. 1109; see also *People v. Lancaster*, *supra*, 41 Cal.4th at p. 102 [" 'It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination.' "].)

Here, the prosecutor's questions were well within the scope of Rojas's direct testimony, which was aimed at establishing that she had overcome the problems that led her to lose custody of Genny, that she cared about Genny and had done what she could to ensure a proper burial, and that despite her feelings for Genny she wanted defendant's life to be spared. Questions about how Rojas's drug problems had affected her as a mother, and positing that no one in the family had wanted Genny, were responsive to considerations raised by the defense and supported by the evidence that Genny was shuttled among Gonzales family households. It was defense counsel who established that Rojas had another daughter named Genny, and that she did not allow Pete to live with her. It was proper for the prosecutor to meet this testimony with evidence that Pete was in fact the father of the second Genny, and had been seen at Rojas's house. The court sustained an objection to the question about why Rojas did not wait until Genny had a headstone before having another baby and naming her "Genny."

---

[30] Defendant contends the prosecutor's tactics, both here and in the closing arguments discussed in the next part, violated her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to a fundamentally fair and reliable penalty verdict.

Defense counsel also introduced the subject of Genny's funeral expenses and her burial in the family plot. The prosecutor was entitled to explore this subject further. It was within the court's discretion to allow the introduction of photographs, so that the jury could see where Genny was buried. Defendant argues that the photographs were improperly admitted as victim impact evidence without the notice required by section 190.3. "Evidence offered as rebuttal to defense evidence in mitigation, however, is not subject to the notice requirement of section 190.3 and need not relate to any specific aggravating factor. (*In re Ross* (1995) 10 Cal.4th 184, 206–207; § 190.3.)" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 109.) Although the prosecutor claimed that the photographs were proper victim impact evidence, the court did not admit them on that ground, but correctly ruled they were rebuttal evidence.

### 2. *The Prosecutor's Closing Argument*

Defendant contends the prosecutor improperly employed inflammatory rhetoric during closing argument, calculated to appeal to the jury's emotions.[31] Before turning to the statements at issue, we note generally that "[u]nlike the guilt determination, where appeals to the jury's passions are inappropriate, in making the penalty decision, the jury must make a moral assessment of all the relevant facts as they reflect on its decision. [Citations.] Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument. [Citation.] But emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment.' [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1418; accord, *People v. Jackson* (2009) 45 Cal.4th 662, 691.)

Defendant objects to the following comments on Mary Rojas's testimony: "As we sat here on Thursday and listened to the victim's mother come into this trial, it had to be

---

[31] Defendant claims violation of her rights to a fundamentally fair trial and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

the most offensive and repulsive testimony ever heard in a courtroom. It was shocking. It was without humanity, and it was without compassion.

"Now, think about this, don't think about it in this case setting; just think about it generically. We had a victim's mother, a victim's mother come in and testify for the defense in a case where a daughter was horribly murdered — that, that is different again than any reality that we will ever know outside of a courtroom like this, a victim's mother testifying for the defense — we didn't just have any victim's mother, it was Genny's mother, this little girl's, in this last photograph that we have of her, her mother.

"And I hate even saying those words, 'mother.' Let's call her the biological mother because that's all she is. She is genetically related to what was Genevieve Rojas, not Genny Rojas, Genevieve Rojas, the old Genny."

After asserting that Rojas's testimony reflected no compassion for Genny, the prosecutor continued: "Real parents who lose a child freak out. They lose their minds. They wear their child's death on their sleeve as a badge. They never get over it. It alters their lives forever. They lose their marriages. They lose their jobs. They end up with alcohol problems. They commit suicide because, when you lose a child, you lose a part of you. That's what being a parent is.

"And if you remember in voir dire, back in February, when I asked you about — and it sounded like a stupid question — what's a parent? It was for Thursday. It was for Mary Rojas, because she's not a parent; she's biologically related to Genny Rojas, and that is it."

A little later, the prosecutor added these comments: "Of course, then she names her daughter 'Genny,' her new Genny. She gets back together with her molesting husband, who molested one of the other daughters. And she testifies on direct that she never sees Pete anymore, Pete Rojas, and that's her choice. Of course, on cross, she finally admits, 'Oh, yeah, he's the father of new Genny.' New Genny, people who lose dogs and cats don't rename their new pets after their old pets. That shows you what a

63

fungible item Genevieve Rojas was to Mary Rojas and this family, if that's what you want to call them."

Defendant argues that Rojas's shortcomings as a parent were irrelevant to the penalty determination, and that the prosecutor sought to dehumanize the entire family in the eyes of the jury. No such objection was raised below, and therefore defendant has forfeited this claim of error. (*People v. Huggins* (2006) 38 Cal.4th 175, 251-252.) Defendant contends the court and both parties agreed that no objections would be required to preserve objections made by defense counsel in advance of the penalty phase arguments. However, counsel did not refer to Rojas's testimony in his anticipatory objections, and made it plain that he understood the necessity of objecting to any new matter he deemed improper.[32]

Even if counsel had objected, the court could properly have allowed this argument. Certainly, Rojas's testimony opposing the death penalty for defendant was an important part of the penalty defense. The prosecutor was entitled to seek to undermine her moral standing and cast doubt on the weight to be given her testimony. What we said in *People v. Dennis* (1998) 17 Cal.4th 468 applies here as well: "In the challenged remarks, the prosecutor did not substantially misstate the facts or go beyond the record. Ultimately, the test for misconduct is whether the prosecutor has employed deceptive or reprehensible methods to persuade either the court or the jury. (*People v. Rowland* (1992) 4 Cal.4th 238, 274.) As we observed in *Rowland*, 'Although harsh and unbecoming, the challenged remarks constituted reasonable — if hyperbolic and tendentious — inferences from the evidence. There is no reasonable likelihood that the

---

[32] Before trial, defense counsel filed a motion seeking to preclude the prosecutor from commenting that Mary Rojas did not care about Genny. This motion, however, concerned only the guilt phase, and was premised on the idea that without calling Mary Rojas to the stand, the prosecutor had no ground for asserting that she did not care about Genny. Thus, the motion did not operate to preserve any objections during the penalty phase. It did, however, demonstrate that the defense was fully aware of the risks entailed in putting Mary Rojas on the witness stand.

jury understood the words otherwise.' (*Id*. at p. 277.)  Here, as was true in *Rowland*, the prosecutor's remarks did not amount to deceptive or reprehensible methods of persuasion." (*People v. Dennis*, *supra*, 17 Cal.4th at p. 522; see also *People v. Huggins*, *supra*, 38 Cal.4th at p. 253.)

Defense counsel did object during the next portion of the argument challenged by defendant on appeal.  We set out this passage in full:

"[The prosecutor]:   Remember who this case is about.  We're here because of this little girl.  She is special, and that's why it's a capital case.  Genny didn't have a trial and she had no one to speak for her, no one in society to speak for her; so I wrote a letter to Genny about what society's outrage is regarding this case.

"[Defense counsel]:  Your honor, I object to this, inflammatory rhetoric, ask for an admonition.

"The Court:  Overruled.  Thus far.

"[The prosecutor]:  Genevieve Rojas, born January 3rd, 1991, murdered July 21st, 1995.  That means she was four and a half when she was murdered and tortured.  Genny, perhaps it was a rainy, balmy day when you first cried in pain.  Perhaps it was a day like this, a sunny day when happy children like to swing in swings, tumble down grassy banks and laugh and experience the freshness of life when the darkness we call child abuse crept into your life.  Wherever it was, whenever it was, Genny, we were not there.  We were too late to hear your cry for help.

"[Defense counsel]:  Objection, your honor.  It's inflammatory rhetoric, ask for an admonition.

"The Court:  Overruled.

"[The prosecutor]:  You were too young to know that we would care, too young to know that you could reach out and we would help you.  We hear your cries of pain now as the story of those horrible last weeks of your life begin to unfold.  It is so painful to picture the life as you saw it, to picture the life of a beautiful little girl being destroyed.

65

We know now what they did to you.  Before your death, we never imagined any human being with a heart and a soul could do that to a human being.

"As if we were hearing a nightmare, we heard how you were handcuffed behind your back and until your tiny biceps bled.  We heard how you were hung from a hook at night in a closet, alone and afraid.  We felt your claustrophobic conditions when the defendant put you into a box, a closet, and a tub to scare you, that you were so frightened that you had diarrhea, which brought about more abuse and more torture.  We know that now, too.

"[Defense counsel]:  Objection, your honor.  Misstates the evidence, ask for an admonition.

"[The prosecutor]:  It's what the defendant said.

"The Court:  Overruled, overruled.  Just let me add a comment, ladies and gentlemen, excuse the interruption of both counsel.  It's impossible in a case like this for there not to be substantial emotions on both sides.  No matter whose version of the events, no matter whose take on the events you hear, it will be loaded with emotion; so you will hear and feel emotion today.  I only remind you that that emotion needs to be channeled through the factors in aggravation, mitigation that I've instructed you about.  Excuse me.  Go ahead.

"[The prosecutor]:  We see the shattered remnants of your smiling face, scarred with burns from a blow dryer as the defendant inflicted unimaginable amounts of pain on what was once your cute little chubby cheeks.  We see the bruises and wounds from people who embraced the pain of hitting a four-year-old in the face.  We see your head, no longer with the wavy locks of a four-year-old child, but the grotesque red masses of a horrible burn.  We try to conceptualize, rationalize and make sense of your maiming, yet we can never know what it feels like to have the skin burned off your naked, bruised body.  We will never know the horror you went through as your skin weeped and your life slowly and methodically was taken away from you.

66

"How did it feel to stare at your abusers as your life ended?  Did you think of love?  Did you think of your choice, your choice to live, your choice to die?  Genny, we do not understand.  All of us want to hold you.  All of us want to stop them from attacking you, but we can't.  It is too late to stop them from hurting you.  And for that, we are truly sorry.  You must have been frightened.  You must have been cold.  You must have been lonely.  You must have been tired and hungry; but worst of all, you must have felt abandoned by all of us.

"To know the agony, the humiliation and the intimidation and other abuse you suffered before you gave into death makes us angry.  To think that death would be a merciful end to your pain only illuminates the torture and abuse that you suffered.  That, too, angers us, anger that society sleeps while other young children like yourself suffer.

"[Defense counsel]:  Objection, your honor.  It's irrelevant, ask for an admonition.

"The Court:  Overruled.

"[The prosecutor]:  That we did not hear you nor see your sadness in your eyes, your fear and your anxiety brings us shame.  You had no spokesperson for life.  And for that, we are truly sorry.  For your whole life, not one person ever cared for you, cared for you as a parent and cared for you as a human being.  You will never be able to go to a ball game, to play soccer, to play bobby sox softball or even go to a school play.  When you needed it most, no one would hold you and love you, love you and tell you that everything would be all right.

"Genny, you will not be forgotten.  We promise that you will not die in vain.  We promise that you will always be in our hearts, in our souls.  We choose, we collectively choose to adopt you and to care for you.

"[Defense counsel]:  Objection, your honor.  Inflammatory rhetoric, statement of personal opinion, ask for an admonition.

"The Court:  Overruled.

"[The prosecutor]:  You —

67

"The Court: Excuse me. With regard to the statement of personal opinion, the personal opinion of none of the attorneys in this case is relevant to you, ladies and gentlemen. Your personal opinions are relevant, and I remind you of that. Go ahead.

"[The prosecutor]: We choose as a group to adopt you and to take care of you. You are a member of our family, those of us who have lived with you here in Department 32. We refuse to reject you as your mother and father did for a life of drugs and molestation. We refuse to ignore you as your grandmother and other relatives did to you. You are us and we are a part of you. We will hold your torturers accountable, no matter what pain it puts us through, for we, Genny, will put you first and foremost in our souls. We will not allow the defendant to portray herself as a victim. We have seen your journey of torture and abuse —

"[Defense counsel]: Your honor, I object, also inflammatory rhetoric, statement of personal opinion, improper, ask for an admonition.

"The Court: Overruled. Go ahead, counsel.

"[The prosecutor]: The defendant is not a victim. No one who does this to a child can ever be called a victim. No one who embraces inflicting pain upon your body should ever be allowed to portray herself as a victim. We know now what a victim is. A victim is someone who has a blow dryer placed against her face, who is hung in a closet and who is stuffed in a box. We, Genny, make a commitment, a commitment to stop the defendant and hold her accountable. Our strength will not wax nor wane despite the assaults on our logic and common sense. We see you as an example of courage and commitment. We will not let you go nor will we ever let you down."

Defendant contends this "letter to Genny" was an improper emotional appeal for the jury to commit themselves to vote for execution, to reject defendant's family and substitute themselves as Genny's family, and to personally exact vengeance for what happened to Genny. Defendant argues that the court's admonitions were ineffective. First, the court told the jurors to channel their emotions through the factors in aggravation

68

and mitigation, in effect telling them to allow the emotions evoked by the prosecutor to be a factor in the weighing process.  Then, the court advised that the attorneys' opinions were irrelevant but the jurors' personal opinions *were* relevant, opening the door for the jury to accept the prosecutor's impassioned assertions, which were couched in the first person plural, and act on the basis of passion and prejudice during deliberations.

The Attorney General responds that the "letter to Genny" was proper as an expression of community outrage (see *People v. Zambrano* (2007) 41 Cal.4th 1082, 1178-1179), an invitation to empathize with the suffering of the victim (see *People v. Dykes* (2009) 46 Cal.4th 731, 794), and a description of Genny's vulnerability (see *People v. Guerra* (2006) 37 Cal.4th 1067, 1156).  Noting that during the penalty phase, "considerable leeway is given for emotional appeal so long as it relates to relevant considerations" (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1110, fn. 35; see also *People v. Riggs* (2008) 44 Cal.4th 248, 323), the Attorney General argues that the trial court properly reminded the jurors to channel emotion through the statutory aggravating and mitigating factors, and to rely on their own opinions rather than those of counsel.

No bright line separates unduly inflammatory prosecutorial argument from legitimate advocacy at the penalty phase of a capital trial, where the jury must make a moral assessment and the harm inflicted on the victims is a relevant consideration.  We have noted that allowing the jury to consider victim impact evidence " 'does not mean that there are no limits on emotional evidence and argument. . . .' " (*People v. Robinson* (2005) 37 Cal.4th 592, 651, quoting *People v. Edwards* (1991) 54 Cal.3d 787, 836.) " ' "[T]he jury must face its obligation soberly and rationally, and should not be given the impression that emotion may reign over reason." ' "  " [A]lthough a court should ' "allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction," ' still, ' "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be

curtailed." ' (*Edwards*, *supra*, 54 Cal.3d 787, 836, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864.)" (*Robinson*, *supra*, 37 Cal.4th at pp. 651-652; see also *People v. Prince*, *supra*, 40 Cal.4th at pp. 1286-1287; *People v. Benavides*, *supra*, 35 Cal.4th at p. 108.)

Here, the court should have curtailed the prosecutor's extended and melodramatic oration couched as a letter to the victim, by sustaining defense counsel's objections and admonishing the jury. Portions of the argument were permissible as expressions of outrage, appeals to empathy, and descriptions of both Genny's vulnerability and defendant's conduct. However, the passages urging jurors to personally feel shame for society's failure to protect Genny and other abused children, the assertion that "we collectively choose to adopt you and to care for you," and similar invitations to take the role of a protective family for this victim were plainly improper. The prosecutor asked the jurors, in emotional terms, to go far beyond their role as the arbiters of punishment prescribed by law. He invited them to consider the failure of society at large to protect abused children, and then to join him in assuming the role of a nuclear family for Genny. These purely emotional appeals invited a subjective response from the jurors and tended to divert them from their proper role of rational deliberation on the statutory factors governing the penalty determination. It was the trial court's responsibility to intervene and redirect the jury, to remind it that its duty was not to replace Genny's family or to answer for the failures of society at large to prevent child abuse, but to reach a penalty decision based on the facts of this case.

The court's admonitions, while partially effective, were insufficient. Reminding the jury to channel its emotions through the aggravating and mitigating factors was appropriate insofar as the prosecutor's emotional appeals related to those factors, or to the jury's proper role as the conscience of the community operating within the criminal justice system. (See *People v. Zambrano*, *supra*, 41 Cal.4th at pp. 1178-1179.) This was not, however, an adequate check on the prosecutor's untethered summons to the jury to

70

"adopt" the victim as the benevolent family she never had, and essentially to act as her protector and advocate during deliberations. Similarly, while it was proper to remind the jury that the opinions of counsel were irrelevant, the court's advice that the jurors' own opinions *were* relevant did not sufficiently stem the effects of the argument soliciting subjective, irrational emotions from the jurors.

We turn to the question of prejudice. In evaluating the effects of improper argument at the penalty phase, " 'we apply the reasonable possibility standard of prejudice first articulated in *People v. Brown* [(1988)] 46 Cal.3d [432,] 448, . . . which . . . is the "same in substance and effect" as the beyond-a-reasonable-doubt test for prejudice articulated in *Chapman v. California* [, *supra*,] 386 U.S. 18.' (*People v. Wallace* [, *supra*,] 44 Cal.4th 1032, 1092.)" (*People v. Dykes*, *supra*, 46 Cal.4th at p. 786.)[33] Thus, we must decide whether there is a reasonable possibility that the jury would have returned a different penalty verdict absent the inflammatory and irrelevant aspects of the prosecutor's "letter to Genny." We conclude there is not, for the following reasons.

First, the prosecutor's improper remarks were not central to the case he presented in closing argument. They were rhetorical flourishes following the prosecutor's initial comments on the defense penalty phase witnesses. The prosecutor then proceeded with a more traditional series of arguments focused on the circumstances of the offense and

---

[33] The Attorney General notes that for purposes of federal constitutional error, "it 'is not enough that the prosecutor's remarks were undesirable or even universally condemned.' [Citation.] The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.) While the *Darden* court did not frame its holding in terms of prejudice (*id*. at p. 183, fn. 15), our review under the reasonable possibility standard is equivalent to a determination whether the prosecutor's inflammatory rhetoric undermined the fundamental fairness of the penalty phase. If there is no reasonable possibility the jury's verdict was affected, the proceeding could not be deemed a denial of due process. Nor would it be an unreliable verdict for purposes of defendant's Eighth Amendment claim.

defendant's character. He methodically went through the statutory aggravating and mitigating factors, and did not return to the objectionable themes of the "letter to Genny."

Second, the circumstances of this murder were almost unimaginably horrible. They involved a prolonged and varied course of neglect, starvation, torture, and maiming ultimately culminating in the death by scalding of a four-year-old child. No medical attention was sought for Genny, and the evidence supported a conclusion that defendant and Ivan continued to abuse her even as she lay dying. All the events took place in defendant's home, and her attempt to escape blame by casting herself as an abused spouse could only have been viewed by the jury as desperately weak.[34] The attitudes expressed by defendant in her videotaped interviews placed her in a very unsympathetic light. The emotions inevitably aroused by the guilt phase evidence were substantially more powerful than those the prosecutor sought to stir in the improper portions of his argument, and were a legitimate factor supporting capital punishment.

Third, the defense at the penalty phase was hobbled by the fact that the adult family members asking the jury to spare defendant's life were themselves complicit in Genny's endangerment. The Negrettes and Mary Rojas had returned Genny to her grandmother, even though they knew she was an abusive caretaker. This was an unusual case in which witnesses who would ordinarily be giving victim impact testimony for the prosecution were not only testifying for the defense, but also had failed to protect the victim. Furthermore, while defendant relied on evidence of her own abuse at the hands

---

[34] At the penalty phase, the defense put little weight on the battered woman theory. It argued that defendant was a minor participant compared to Ivan, and that her culpability was mitigated by intoxication, posttraumatic stress disorder, and her own history of abuse as a child. Counsel urged the jury to consider the impact of a death verdict on defendant's family, especially her children, to avoid vindictive emotion during deliberations, and to consider that life in prison was an appropriately harsh punishment.

Nevertheless, the jury would naturally and properly have considered the evidence presented at the guilt phase, including defendant's attempt to cast herself as an abused victim rather than an abuser.

of her parents and husband, the abuse she described paled in comparison to the torture and maiming she and Ivan inflicted on Genny. When a murder is the result of extreme forms of child abuse, mitigating evidence of the kind presented here loses much of its persuasive impact.

For all these reasons, we hold that there is no "reasonable (i.e., realistic) possibility" that the jury was diverted from returning a life sentence by the improper arguments in the prosecutor's "letter to Genny." (*People v. Brown*, *supra*, 46 Cal.3d at p. 448; see *People v. Cowan* (2010) 50 Cal.4th 401, 491.)

Defendant raises a final claim of improper argument. The prosecutor, in the course of asserting that defendant's participation in the murder was not minor (§ 190.3, factor (j)), commented: "One other thing that proves she did it, and that's her child abuse history. She learned, she was schooled in terror. She has a bachelor's degree in child abuse. She learned to discipline and she learned to punish. She is Tillie [defendant's mother] — actually, she's worse than Tillie. She's graduated. She has a Ph.D. in child abuse." Defendant incorporates by reference her guilt phase arguments that the prosecutor made improper use of the child abuse evidence (pt. II.A.2., *ante*) and contends it was unconscionable to again use that evidence to persuade the jury that death was the proper penalty.[35] Defendant did not object at trial, and therefore she has forfeited this claim of error. (*People v. Huggins*, *supra*, 38 Cal.4th at p. 251-252.) In any event, we have held that the prosecutor was properly allowed during the guilt phase to respond to the evidence of abuse during defendant's childhood with expert testimony that such a history can lead the victim to become an abuser. (Pt. II.A.2., *ante*.) His passing reference to this point in closing at the penalty phase overstated the impact of that

---

[35] Defense counsel made this objection in advance of the penalty phase argument. The court ruled that both sides were free to argue the inferences that might rationally be drawn from the child abuse evidence.

testimony, but was not so flagrant as to amount to misconduct or to prejudice the jury's deliberations.

### 3. *Restriction of Defense Counsel's Closing Argument*

In a discussion before the penalty phase began, defense counsel indicated that he intended to talk about other capital cases only if the prosecutor argued that "if there ever was a case that cries out for the death penalty, this is it." The prosecutor said he did indeed intend to make that argument. The court was skeptical about "counsel litigating other cases in their argument." Further discussion was deferred. When the parties returned to the subject, defense counsel explained that he meant to respond to the prosecutor's argument by commenting on two or three other cases, such as the murder of Martin Luther King, Jr., the murders of children by Wayne Williams in Atlanta, and the Terry Nichols prosecution for the Oklahoma City bombing. He wanted to tell the jury about "cases that people are generally familiar with through the media that are bad cases [where] there wasn't a death penalty for whatever reason . . . just to show that the death penalty . . . isn't always required for every single bad case and is not mandatory."

The prosecutor responded that there were many reasons why the death penalty was not imposed in such cases, which he would explore if defense counsel mentioned them. The court was not willing to allow references to other specific cases, noting that it would take the focus away from the individualized sentencing determination that was the jury's task, and divert its attention toward the various reasons why the death penalty was not administered in other cases. However, the court told defense counsel he was free to tell the jurors that they were all aware of other horrible cases in which the death penalty was not imposed, without mentioning specific instances. The court noted that the prosecutor's argument was "hyperbole," and added "you're absolutely entitled to meet that on the same level that it's offered."

74

Defendant contends the court improperly restricted defense counsel's argument.[36] We disagree. In the first place, as a matter of logic the prosecutor did not open the door to an exploration of other murder prosecutions by claiming, as he did in closing argument, that "if any murder requires the death penalty, this is it. If this isn't an appropriate case for capital punishment, then nothing is." This is not a comparative claim, but a categorical one. The consideration that other cases might seem equally appropriate for capital punishment, yet not reach that result, is not responsive to the assertion that *this* case justifies the death penalty if *any* case does. The prosecutor's argument was not premised on the notion that the present case was worse than any other, or that all similar cases required the death penalty. Instead, it stood on the ground that defendant's case was so suitable for capital punishment that the only justification for not imposing it would be an objection to capital punishment in all cases. This is an entirely proper argument and does not invite comparisons with other specific notorious cases.

Furthermore, the court was rightly concerned with the distraction involved in the argument proposed by defense counsel. To meet the point counsel wanted to make, the prosecutor would have been entitled to explain why the death penalty was not imposed in the other cases. We have repeatedly upheld trial court restrictions on arguments comparing a defendant's case to other well-known murders. (*People v. Farley*, *supra*, 46 Cal.4th at p. 1130-1131, citing cases; see also *People v. Ervine* (2009) 47 Cal.4th 745, 800-801.) "A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact. [Citations.] This right is not unbounded, however; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark. [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 854-855.) The court did not abuse its discretion here.

---

[36] Although she recognizes that such a claim of error is grounded in the Sixth Amendment right to counsel, defendant also asserts error under the Fifth, Eighth, and Fourteenth Amendments.

4. *Alleged Flaws in Capital Trial and Sentencing Procedures*

Defendant raises a series of familiar objections to California capital trial and sentencing procedures. We reject them, as we have before. Thus:

Defendant asserts that the trial court erred by refusing her request for sequestered voir dire pursuant to *Hovey v. Superior Court* (1980) 28 Cal.3d 1. She contends the *Hovey* procedures are constitutionally required. We have rejected that claim, and do so again here. (E.g., *People v. Lewis* (2008) 43 Cal.4th 415, 494; *People v. Brasure* (2008) 42 Cal.4th 1037, 1050-1051; *People v. Alfaro* (2007) 41 Cal.4th 1277, 1315.)

The federal constitution requires neither unanimity nor proof beyond a reasonable doubt for the jury to make findings on aggravating and mitigating factors. The reasonable doubt standard is also inapplicable to the jury's determination that death is the appropriate penalty. Nothing in *Cunningham v. California* (2007) 549 U.S. 270, *Apprendi v. New Jersey* (2000) 530 U.S. 466, or *Ring v. Arizona* (2002) 536 U.S. 584, affects our conclusions in these regards. (E.g., *People v. Martinez* (2009) 47 Cal.4th 399, 455; *People v. Farley*, *supra*, 46 Cal.4th at pp. 1133-1134; *People v. Loker* (2008) 44 Cal.4th 691, 755.)

The absence of written findings reflecting the jury's consideration of the sentencing factors does not violate a defendant's constitutional rights. (E.g., *People v. Martinez, supra*, 47 Cal.4th at p. 455; *People v. Farley*, *supra*, 46 Cal.4th at p. 1134; *People v. Loker*, *supra*, 44 Cal.4th at p. 755.)

The statutory special circumstances that qualify a defendant for the death penalty, including the felony-murder special circumstance, are not unconstitutionally overbroad. (E.g., *People v. Farley*, *supra*, 46 Cal.4th at p. 1133; *People v. Loker*, *supra*, 44 Cal.4th at p. 755; *People v. Harris* (2005) 37 Cal.4th 310, 365.)

Intercase proportionality review is not constitutionally required. (E.g., *People v. Martinez, supra*, 47 Cal.4th at p. 455; *People v. Farley*, *supra*, 46 Cal.4th at p. 1134; *People v. Loker*, *supra*, 44 Cal.4th at p. 755.)[37]

The use in the sentencing factors of such adjectives as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (§ 190.3, factor (g)) does not act as an unconstitutional barrier to the consideration of mitigating evidence. (E.g., *People v. Martinez, supra*, 47 Cal.4th at p. 455; *People v. Farley*, *supra*, 46 Cal.4th at p. 1134; *People v. Parson* (2008) 44 Cal.4th 332, 369-370.)

Defendant claims broadly, and without supporting argument, that the factors in aggravation provided in section 190.3 have been applied so broadly as to result in arbitrary and contradictory results. We have consistently rejected this argument in connection with the broadest factor, the "circumstances of the crime." (§ 190.3, factor (a); see, e.g., *People v. Brady* (2010) 50 Cal.4th 547, 590; *People v. Farley*, *supra*, 46 Cal.4th at p. 1133; *People v. Loker*, *supra*, 44 Cal.4th at p. 755.) Defendant offers no reason for altering our conclusion with respect to the other more specific aggravating factors.

Prosecutorial discretion in deciding whether to seek the death penalty does not result in a violation of equal protection, due process, or reliability in capital sentencing. (E.g., *People v. Brady*, *supra*, 50 Cal.4th at p. 589; *People v. Harris*, *supra*, 37 Cal.4th at p. 366; *People v. Brown* (2004) 33 Cal.4th 382, 403.)

The delays entailed in the appellate process for capital cases do not amount to cruel and unusual punishment. (E.g., *People v. Brady*, *supra*, 50 Cal.4th at p. 589;

---

[37] Defendant also asserts that California unconstitutionally fails to require intracase proportionality review. However, as the Attorney General points out, this court routinely performs such review. (E.g., *People v. Kelly* (2007) 42 Cal.4th 763, 800.) For the first time in her reply brief, defendant claims error in the failure to permit her *jury* to perform intracase proportionality review by comparing her culpability with that of her husband Ivan. Even if this claim were timely raised, defendant fails to explicate it in sufficient detail to permit meaningful review.

*People v. Bennett*, *supra*, 45 Cal.4th at pp. 629-630; *People v. Jones* (2003) 29 Cal.4th 1229, 1267.)

Defendant claims that this court has been so influenced by political pressure in its review of capital cases that various constitutional rights associated with meaningful appellate review have been abrogated. We disagree, as we have in past cases. (E.g., *People v. Prince*, *supra*, 40 Cal.4th at p. 1299; *People v. Avila* (2006) 38 Cal.4th 491, 615; *People v. Kipp* (2001) 26 Cal.4th 1100, 1140-41.)

The failure to provide for a "presumption of life" does not violate the federal constitution. (E.g., *People v. Lomax* (2010) 49 Cal.4th 530, 594-595; *People v. Gamache* (2010) 48 Cal.4th 347, 407; *People v. Parson*, *supra*, 44 Cal.4th at p. 371.) Nor does California's death penalty law violate international law, such as the International Covenant on Civil and Political Rights, or the American Declaration of the Rights and Duties of Man. (E.g., *People v. Hamilton* (2009) 45 Cal.4th 863, 961; *People v. Alfaro*, *supra*, 41 Cal.4th at p. 1332; *People v. Avila*, *supra*, 38 Cal.4th at p. 615.)

### 5. *Cumulative Prejudice*

Defendant argues that errors deemed harmless at the guilt phase may nevertheless have been determinative at the penalty trial. We have reviewed the cumulative impact of the guilt phase errors above, and entertained no reasonable doubt that they had any significant impact on defendant's conviction. (Pt. II.A.6., *ante*.) We also conclude there is no reasonable possibility that they affected the penalty determination. (See *People v. Prince*, *supra*, 40 Cal.4th at p. 1299.)

Defendant further argues that her penalty phase presented an unusually close case, so that any error during that phase must be deemed prejudicial. We have concluded that the court's error in failing to curtail unduly inflammatory passages in the prosecutor's closing argument was harmless, "under the most exacting standard of review." (*People v. Prince*, *supra*, 40 Cal.4th at p. 1299; see pt. II.B2., *ante*.) Defendant contends this case involved only "a single period of aberrant behavior," and that the evidence in mitigation

78

was compelling. While it is true there was only one victim here, the evidence demonstrated that defendant was at least complicit in the abuse and torture Genny suffered for a period of weeks if not months. This prolonged course of conduct culminated in a particularly horrible death by scalding that defendant did nothing to avert, despite ample opportunity to seek help. When these circumstances are balanced against the evidence in mitigation, we cannot say this was an especially close case at the penalty phase. We will not disturb the jury's verdict.

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**

**CONCURRING AND DISSENTING OPINION BY WISEMAN, J.**

I concur with the majority's conclusion that there was no reversible error in the guilt phase portion of the trial. I also agree that portions of the prosecutor's letter to Genny Rojas were "plainly improper." (Maj. opn., *ante,* at p. 70.) I disagree, however, with the majority's holding that the reading of the letter was harmless error. To be reversible error, there need only be a *reasonable possibility* that the jury would have returned a verdict of life without possibility of parole if the prosecutor had not improperly appealed to the jury's passions. Based on this record, I cannot say there is no reasonable possibility. On the basis of this one issue, I would conclude the sentence of death must be reversed.

I fully recognize that many cases have held that a prosecutor's argument, although emotional, does not cause the proceedings to cross over into the realm where emotion reigns over reason. (E.g., *People v. Leonard* (2007) 40 Cal.4th 1370, 1418 ["'Emotion must not reign over reason and, on objection, courts should guard against prejudicially emotional argument'"].) Neither the cases cited by the parties nor any case I have located, however, contain anything similar to the prosecutor's letter to Genny.

In numerous cases, this court has approved prosecutors' penalty phase arguments that urged the jury to stand in the victims' shoes and consider the pain and fear felt by the victims and the years of life of which the victims were deprived. (E.g., *People v. Slaughter* (2002) 27 Cal.4th 1187, 1212; *People v. Cole* (2004) 33 Cal.4th 1158, 1233; *People v. Chatman* (2006) 38 Cal.4th 344, 388.) In other cases, the court has approved

1

penalty phase arguments urging the jury to consider the anguish felt by the victims' families.  (E.g., *People v. Jackson* (2009) 45 Cal.4th 662, 692.)  The court has also approved penalty phase summations stating that all members of society are victims when a person is murdered and describing the jurors as the conscience of an injured society.  (*People v. Mendoza* (2007) 42 Cal.4th 686, 706.)

In none of those cases, however, did the prosecutors reach the emotional pitch the prosecutor attained in his letter in this case.  No previous case has approved an argument in the form of an impassioned, imaginary letter to a child victim.  The court has never found proper an invitation to jurors to adopt the victim posthumously and become her parents.  Never before has the court found proper or harmless an argument that purports—using the first person plural—to speak for the jurors themselves, saying "[y]ou are a member of *our* family, those of *us* who have lived with you here in Department 32," and "*we* will hold your torturers accountable" by imposing death.  (Italics added.)  In this case, the prosecutor's argument not only undertook to replace the jurors' reason with their emotions as adoptive "parents," it also undertook to tell them in their own voices what their decision was.  Because of the tactics of (1) telling the jurors that they not only should sympathize with the victim but that they *were the victim's parents*, and (2) identifying the jurors with the *prosecutor* ("we") and telling them *we will* impose death, the prosecutor's letter is something new.

Case law makes it clear that emotion is relevant to a jury's assessment of the suitability of the death penalty.  (*People v. Leonard, supra,* 40 Cal.4th at p. 1418 ["'emotion need not, indeed, cannot, be entirely excluded from the jury's moral assessment'"].)  We are confronted here with the rare situation in which the prosecutor's penalty phase argument goes too far.  It is essential that the point at which passion becomes excessive be real and enforceable, and enforced, not merely theoretical.

In my opinion, the prosecutor's letter in this case crosses the line.  This court's discussion of a Texas case in *People v. Robinson* (2005) 37 Cal.4th 592 is instructive.

2

The *Robinson* court described *Salazar v. State* (Tex.Crim.App. 2002) 90 S.W.3d 330 as an "extreme example" of a "due process infirmity." (*Robinson, supra,* at p. 652.) In *Salazar*, the prosecution introduced a 17-minute video montage of the victim's life, which included 140 photographs and was set to emotional music, including "My Heart Will Go On" by Celine Dion from the soundtrack of the film Titanic (20th Century Fox 1997). The Texas Court of Criminal Appeals reversed a lower court's ruling that this presentation was admissible and remanded for an assessment of prejudice. The Texas court stated that "'the punishment phase of a criminal trial is not a memorial service for the victim. What may be entirely appropriate eulogies to celebrate the life and accomplishments of a unique individual are not necessarily admissible in a criminal trial ….'" (*Robinson, supra,* at p. 652.) After remand, the error was found prejudicial. (*Id.* at p. 652, fn. 32.) The prosecutor's letter in this case was argument, not evidence, but its purpose and effect were similar.

The situation in *People v. Mendoza*, *supra,* 42 Cal.4th at page 706, illustrates how the letter was excessively emotional. In *Mendoza*, the prosecutor stated in the penalty phase summation that people in society as a whole were victims of the murder. This court held that this was a proper argument about the harm to society done by the defendant. The prosecutor went on, however, to state that the jurors in particular were victims because the defendant burdened them with the difficult duty of deciding whether to impose death. This court held that it was improper to single out the jurors as especially victimized, but concluded that the trial court identified the error and gave an adequate curative instruction.

In this case, the prosecutor did not tell the jurors they were victims, but told them they were something perhaps even more emotionally powerful—*the victim's parents*. The prosecutor did not merely ask the jurors to stand in the victim's shoes or the victim's family's shoes. He informed the jurors that "we"—himself and the jury—*were* the victim's parents by adoption. This is not a proper role for a juror to assume even in a

3

death penalty case where appeals to emotion are appropriate. The reason why becomes obvious by simply looking to the prosecutor's own words used when describing the role of a parent. He said, "Real parents who lose a child freak out. They lose their minds. They wear their child's death on their sleeve as a badge. They never get over it. It alters their lives forever. They lose their marriages. They lose their jobs. They end up with alcohol problems. They commit suicide because, when you lose a child, you lose a part of you. That's what being a parent is." Despite defense counsel's objections to the reading of the letter, the court gave no curative instruction except the general statement that the attorneys' personal opinions were not relevant, which, as the majority holds, was insufficient.

The United States Supreme Court's comment in *Gardner v. Florida* (1977) 430 U.S. 349, 358, is relevant to our situation: "It is of vital importance to the defendant *and to the community* that any decision to impose the death sentence be, *and appear to be*, based on reason rather than caprice or emotion." (Italics added.) A death sentence lacks the moral authority the community intends it to have if, because of a prosecutor's overzealous evocation of the passion for retribution, the sentence appears not to have issued from the jurors' reason. In this case, the prosecutor's argument created a danger that the jury's death verdict was not reached through reason but instead as a result of an overzealous desire to exact parental retribution.

I am aware that this court has held that retribution is a proper purpose for imposing the death penalty. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1178, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) This does not mean, however, that there should be *no* limits on the amount or kinds of passion for retribution the prosecution is permitted to evoke. The combination of retribution as an acceptable purpose and emotion as an appropriate factor, without limits, has the potential to overwhelm reason.

4

On the subject of prejudice, what I have already said shows part of the reason the prosecutor's erroneous use of the letter was not harmless. As the majority states, an exacting standard of harmless error review applies: There must be no reasonable *possibility* that the jury would have rendered a different penalty verdict absent the error, a standard equivalent to the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1092.) In my view, the extreme emotional nature of the letter makes it reasonably *possible* that the improper argument tipped the balance. The majority takes the position that the letter was not "central" to the prosecutor' summation (maj. opn., *ante*, at p. 71). I respectfully disagree with this conclusion and, to the contrary, believe the letter likely was the most memorable part of the prosecutor's summation. The prosecutor was an experienced attorney and used the letter as a very powerful strategy in a highly emotional case. It must have been obvious to the prosecutor that his use of the letter to Genny was having a major impact on the jury in light of the repetitive and impassioned nature of the defense objections to it.

The nature of Gonzales's penalty phase defense, in my view, reinforces this conclusion. Gonzales wanted the jury to believe that Ivan was the actual killer and that she was a minor participant. She also wanted the jury to believe that her responsibility for failing to try to stop Ivan or get help for Genny was mitigated by battered woman syndrome, her own history of abuse as a child, posttraumatic stress disorder, and intoxication. She wanted the jury to find that, because of these factors, even though her conduct still constituted first degree murder, life without parole would be an adequate punishment. Without the improper argument, it is reasonably *possible* that the jury could have accepted her contentions and concluded that she should receive life without possibility of parole.

The majority states that the facts were so horrible that the improper influence of the letter must have been of minor significance by comparison. (Maj. opn., *ante*, at p. 72.) This may well be so with respect to Gonzales's *guilt* phase objectives, for the

5

evidence that Gonzales was guilty on one or another of the theories of first degree murder presented by the prosecution was very powerful. At the penalty phase, however, matters were different. The jury *could* have concluded that, despite Gonzales's guilt, it was likely that Ivan was the actual killer or that Gonzales's culpability was lessened by the factors she presented, or both. It could have found that, under these circumstances, life without parole would be enough punishment. There is a reasonable *possibility* that this would have happened had the prosecutor not read the letter. This may not be reasonably *probable* because, for instance, there was evidence that Gonzales was dominant over Ivan. It is still reasonably *possible*, which is the standard we must apply.

The majority also states that a life verdict was unlikely because "the defense at the penalty phase was hobbled by the fact that the adult family members asking the jury to spare defendant's life were themselves complicit in Genny's endangerment." (Maj. opn., *ante*, at p. 72.) Without any doubt, the family members asking the jury to spare Gonzales's life were not ideal witnesses. This does not show beyond a reasonable doubt, however, that the jury would not have been persuaded to impose life without parole absent the improper argument. Her penalty phase defense had other components.

The majority states that Gonzales's mitigation evidence in general "loses much of its persuasive impact" because the murder resulted from terrible forms of child abuse. (Maj. opn., *ante*, at p. 73.) The question, however, is not how persuasive we find the mitigation evidence to be, but whether there is a *reasonable possibility* the jury would have found it persuasive absent the improper appeal to passion. I do not believe we can say with any confidence that there is not.

For example, the majority concludes that the evidence that Gonzales was herself abused as a child "paled in comparison" with the crime of which she was convicted (maj. opn., *ante*, at p. 73), so it too has little persuasive impact. It is reasonably possible, however, that the jury would have found otherwise absent the prosecutor's improper appeal to passion. A major theme on which the prosecution relied, of course, was the

6

horror of child abuse.  There is little doubt that the prosecution was keenly aware that this theme could be turned against it in the penalty phase because Gonzales also was an abused child.  The prosecutor's recognition of the possible impact of this evidence is apparent in his effort to undermine it by making the novel assertion that Gonzales's history as an abused child somehow proved she was the actual killer.  He said, "'[o]ne other thing that proves she did it, and that's her child abuse history.  She learned, she was schooled in terror.…  She has a Ph.D. in child abuse.'"  (Maj. opn., *ante,* at p. 73.)

The prosecutor evidently did not believe that the abuse Gonzales suffered as a child was comparatively insignificant, for he went to considerable rhetorical lengths in trying to neutralize its effect on the jury.  In fact, his strategy was emphatically *not* to minimize the abuse she suffered—this must have seemed to him unlikely to persuade— but to magnify it and turn it against her.  Absent the improper appeal to passion, the jury might have been moved to mercy by the evidence of Gonzales's childhood suffering while at the same time rejecting the prosecution's unusual contention that this suffering increased her culpability.

In summary, I fear that holding that the prosecutor's improper argument was harmless in this case establishes a new low bar for harmless error on the issue of appealing to passion in penalty phase closing arguments.  The law intends to make it relatively difficult for the prosecution to show harmless error when the prosecutor improperly appeals to emotion in the penalty phase of a capital trial.  This is why the legal standard of review requires a mere reasonable *possibility* of prejudice in order to reverse a verdict of death.  It is, in my opinion, essential for the court to ensure that the

rule has some teeth and will be enforced. Otherwise, overly zealous prosecutors may be incentivized to push the limits without serious fear of reversal. I believe the death penalty verdict should be reversed.


                                            _____

                                            Wiseman, J.[*]

---

[*]    Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gonzales
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S072316
**Date Filed:** June 2, 2011
_____

**Court:** Superior
**County:** San Diego
**Judge:** Michael D. Wellington


_____

**Counsel:**

Mark E. Cutler, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala G. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark E. Cutler
Post Office Box 172
Cool, CA  95614-0172
(530) 885-7718

Annie Featherman Fraser
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2427